IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WALTER ALEXANDER SORTO, | § | |
|     Petitioner, | § | |
| | § | |
| v. | § | H-10-CV-613 |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
|     Respondent. | § | |

## MEMORANDUM AND ORDER

In 2003, a Texas jury convicted Walter Alexander Sorto of capital murder and sentenced

him to death.  After unsuccessfully availing himself of Texas' appellate and habeas remedies,

Sorto petitions for federal habeas corpus relief.  (Docket Entry Nos. 1, 15, 31.)  Respondent

William Stephens has filed an answer arguing that procedural limitations and substantive federal

law make habeas relief unavailable.  (Docket Entry No. 36.)  Sorto has filed a reply.  (Docket

Entry No. 37.)  After considering the record, the pleadings, and the applicable law, the Court

finds that Sorto has not shown an entitlement to habeas relief.  Accordingly, the Court will

**DENY** Sorto's petition.

## BACKGROUND

On the morning of June 1, 2002, the police received a report of a vehicle sitting in the

middle of the street in an industrial area of Houston, Texas.  Tr. Vol. 27 at 145–47, 152.[1]  The

police found two female bodies inside the vehicle.  *Id.* at 152.  Blood stained the rear interior of

---

[1] Sorto's state litigation has resulted in a complex state court record containing many different volumes. For the purposes of this Memorandum and Order, the Court will use the following citations: "Clerk's Record" refers to the filings at the state trial court level, including pretrial motions, trial court orders, jury instructions, and other pleadings from Sorto's trial; "Tr. Vol." refers to the transcripts of proceedings held at the trial level, including hearings on pretrial motions, jury voir dire, and the guilt/innocence phase; "State Habeas Record" and "Successive State Habeas Record" refer to his state habeas proceedings.

the vehicle and the area around the rear passenger door.  *Id.* at 147, 155, 162, 167.  The police identified the deceased women as Maria Rangel and Roxana Capulin, both of whom had been missing since leaving their jobs at El Mirado restaurant the night before.  *Id.* at 219.

Ms. Rangel, who was still wearing her apron from work, had duct tape binding her hands, mouth, and eyes.  *Id.* at 162–63, 219–20.  Ms. Capulin had duct tape over her eyes and mouth. Tr. Vol. 27 at 162.  Both corpses bore signs of sexual trauma.  Tr. Vol. 30 at 44–45; Tr. Vol. 33 at 79–99.  Ms. Rangel had been shot twice in the head.  Tr. Vol. 30 at 43–44.  Ms. Capulin died from a single gunshot wound.  *Id.* at 43–44.

Ms. Rangel and Ms. Capulin had been working until closing time on May 31, 2002.  Tr. Vol. 27 at 75.  Other than a witness who saw the women talking to two men outside the restaurant after closing, no one had provided the police with any information about what had transpired.[2]  The police were stymied in their investigation for more than two months.  *Id.* at 224; Tr. Vol. 29 at 52.

On August 20, 2002, a confidential informant contacted Harris County Sheriff's Deputy Miguel Gonzalez with information about the killings.  Tr. Vol. 28 at 17.  Deputy Gonzalez and Detective Alejandro Ortiz arranged to meet the informant at a hotel that evening.  *Id.* at 19–20. Sorto was with the informant at the hotel when the officers arrived.  Sorto told the police officers that he had information about the murders.  *Id.* at 22–23.[3]  Sorto told the officers that, although he was not a participant in the offense, he had seen Edgardo Cubas and Eduardo Navarro, a

---

[2]  At around 10:00 p.m., Ms. Capulin called her husband and said she would be closing the restaurant and coming home soon. Tr. Vol. 27 at 130–32.  A co-worker left at 10:15 p.m. while Ms. Capulin and Ms. Rangel were still closing the restaurant.  *Id.* at 75.  When Ms. Capulin's husband called fifteen minutes later, no one answered. *Id.* at 132–34.  Concerned that she had not returned home, Ms. Capulin's husband drove to the restaurant, finding her Dodge Durango gone and the building chained shut, but still unlocked.  *Id.* at 134–36.  A witness drove past the restaurant at 11:15 p.m.  *Id.* at 83.  He observed the two victims talking to two men, as one of the women put a chain on the restaurant door.  *Id.* at 83–86.

[3]  The interview took place in Spanish. Tr. Vol. 24 at 27.

2

teenager, abduct the two women.  *Id.* at 23–25.  He claimed to have left, however, when he heard gunshots.  *Id.* at 25.

Considering Sorto a witness to a double murder, Detective Ortiz asked him to continue the interview at the Harris County Sheriff's homicide office.  Tr. Vol. 24 at 16–18; Tr. Vol. 28 at 43–44, 54–56.  The police and Sorto traveled there in separate vehicles.  Tr. Vol. 24 at 16–17; Tr. Vol. 28 at 58.  At the homicide office, Sorto first repeated the story he had told the officers at the hotel.  *Compare* Tr. Vol. 28 at 23–25 *with* Tr. Vol. 41, State's Ex. 1A at 5–23.  After an hour of discussion, Detective Ortiz left Sorto "kind of stunned" by asking for a saliva sample.  Tr. Vol. 34 at 61.  Sorto asked: "What is this exam?  Is it pretty good, 100 percent or what?"  Tr. Vol. 29 at 10.  According to Detective Ortiz, Sorto then began to "change the story."  Tr. Vol. 24 at 56.  He said that, after Cubas had shot the two women, Cubas forced Sorto to return to the scene and have sex with Ms. Rangel's corpse.  Tr. Vol. 41, State's Ex. 1A at 49–52.

After learning that Sorto had an outstanding arrest warrant, Detective Ortiz took him into custody.  Tr. Vol. 24 at 33.  In a series of subsequent interrogations, Sorto admitted to committing several crimes, many of which also involved Cubas.  Tr. Vol. 41, State's Ex. 5B; Tr. Vol. 42, State's Exs. 6, 7, 8.  Importantly, in an interview beginning at about 8:25 a.m. the following morning, Sorto gave the police a different version of the murders of Ms. Rangel and Ms. Capulin, this time admitting to having participated in sexual assault.  Tr. Vol. 41, State's Ex. 5B at 32–45.  The Texas Court of Criminal Appeals summarized Sorto's confession as follows:

> Cubas picked [Sorto] up in his Honda Accord at about 8:30 p.m. and they picked up fourteen-year-old Navarro.  [Sorto] and Cubas went to a few bars while Navarro waited in the car; then they went looking for a bar that would admit Navarro.  Cubas, who was in possession of a 9-millimeter Beretta pistol, said that he wanted to commit a robbery because he needed money to pay rent.  They were driving on Canal Street when they saw two women coming out of a restaurant.  Cubas parked in a nearby parking lot, got out of the car, and approached the

women from behind as they were walking toward the Durango.  Cubas motioned for [Sorto] to come over to them, and Cubas made Roxana Capulin give [Sorto] the keys.  Ms. Capulin sat in the back seat with Cubas, Maria Rangel sat in the middle seat, and [Sorto] drove the vehicle.  As [Sorto] drove to an area near "Dixie and Wayside," Cubas placed tape over the eyes and mouths of the women and bound Ms. Rangel's hands with tape. Cubas wanted to sexually assault Roxana Capulin, so he told Ms. Rangel "to get down from the truck" when they stopped.  Ms. Rangel fell out of the car onto the ground.  [Sorto] also got out of the car, and Cubas stayed inside with Roxana Capulin.  When Ms. Rangel later got too close to the car, Cubas pointed the gun at her and told her to take her clothes off.  He told [Sorto] "to fuck her by force," and [Sorto] "gave her like 3 thrusts" and ejaculated.  [Sorto] then "fixed . . . her pants" and put her back inside the Durango, where Cubas was forcing Ms. Capulin to perform oral sex on him.

*Sorto v. State*, 173 S.W.3d 469, 474 (Tex. Crim. App. 2005).   Although he confessed to kidnapping and rape, Sorto still maintained that he was not involved in the murders.  He told the police that, as Cubas continued the sexual assault of Ms. Capulin, he:

told Cubas to let the women go.  He drove the car a short distance, then turned it off, left the key in the ignition, got out, and started walking away.  As he was walking to the Accord where Navarro was waiting, he heard three shots coming from the direction of the Durango. Cubas then came running toward him, and they got into the Accord with Navarro and left.  When [Sorto] asked Cubas what happened to the women, he said, "I killed them whores."  Cubas said he had taken money and jewelry from the women, and he showed [Sorto] a chain that belonged to one of them. Cubas dropped [Sorto] and Navarro off at the apartment complex where they both lived at about 12:05 a.m.

*Id.*

The State of Texas charged Sorto with capital murder for intentionally and knowingly killing both women during the course of the same criminal transaction.  Clerk's Record at 6.  The State soon thereafter gave Sorto notice that it intended to seek a death sentence.  Clerk's Record at 7.

4

Trial counsel[4] moved to suppress Sorto's police statements.  Clerk's Record at 78–80, 102–105, 319–22.  The defense maintained that, when the police interviewed Sorto at the police station, they considered him a suspect, not a witness.  Tr. Vol. 25 at 51–52.  The defense argued that Sorto was in custody long before the police read him the *Miranda* warnings.  *Id.* at 52–53.  Even then, the defense contended that Sorto did not understand the constitutional rights he waived.  *Id.* at 55.  The trial court held a lengthy hearing.  *See generally* Tr. Vol. 24; Tr. Vol. 25.  The police officers present during Sorto's statements testified that he voluntarily confessed to his involvement in the various crimes.  *See*, *e.g.*, Tr. Vol. 24 at 17–18, 43, 97–100.  Sorto explained that, while he understood the words in the *Miranda* warnings, he did not comprehend the concepts they represented.  Tr. Vol. 24 at 169–72.  The trial court refused to suppress Sorto's police statements.  Tr. Vol. 25 at 70–71.

Although the State had both Sorto's confession and the DNA evidence from the saliva sample taken by the police which conclusively linked him to the crime, it lacked any objective evidence that put the murder weapon in either Cubas's or Sorto's hand.  The only suggestion as to who actually shot the two women came from Sorto's statement.  The State, therefore, did not commit itself to a specific narrative.  The jury instructions provided for Sorto's conviction if: (1) he actually shot the victims; (2) he was a party to the offense; or (3) he conspired to kill them.  Under the latter two theories, the State argued that, even if Sorto did not pull the trigger, he knew that Cubas would.[5]

---

[4] Alvin Nunnery, Cruz Cervantes, and Patrick McCann represented Sorto in the trial court.  The Court will refer to these attorneys jointly as "trial counsel" unless necessary to identify one individual.

[5] "[E]very defendant on trial for homicide is to be judged according to his own intent . . . ." *Leslie v. State*, 57 S.W. 659, 660 (Tex. Crim. App. 1900).  A non-triggerman, however, may still be convicted of capital murder under Texas' law-of-the-parties or under a conspiracy theory.  Texas' law-of-the-parties allows for a defendant's conviction "if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ."  TEX. PENAL CODE § 7.02(a)(2).  "In

The State supported its argument that Sorto knew Cubas would kill Ms. Rangel and Ms. Capulin by pointing to another crime Cubas and Sorto had committed together. On January 18, 2002—only months before the crime at issue—fifteen-year-old Esmeralda Alvarado was raped and murdered. DNA evidence linked Sorto and Cubas to Ms. Alvarado's rape. Tr. Vol. 33 at 106–10. Sorto had confessed to involvement in the rape of Ms. Alvarado, though he had fingered Cubas as the shooter. Tr. Vol. 42, State's Ex. 6A. The State argued that Sorto knew Cubas would kill Ms. Rangel and Ms. Capulin after the sexual assaults, just as he had done in the past with Ms. Alvarado, and, as such, Sorto was a party or conspirator to the murders of Ms. Rangel and Ms. Capulin.

The defense adopted a strategy that would maintain credibility with the jury while still undercutting the State's case for a capital conviction. To that end, Sorto pleaded guilty to sexual assault and kidnapping, but not guilty to capital murder. Tr. Vol. 27 at 44. Sorto's defense rested on the jury believing his story that, after raping one victim, Sorto left the scene before Cubas fired any shots. The defense urged the jury to find no evidence that Sorto pulled the trigger, encouraged Cubas to kill the women, or anticipated that the women would be killed.

---

determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). Under TEXAS PENAL CODE § 7.02(b), co-conspirators are also responsible for each others' actions:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

The State's closing alternatively argued that Sorto was the shooter, that he was a party to the commission of two murders, and that he anticipated Cubas' killing of the two women. Tr. Vol. 34 at 14–15.

6

The jury found Sorto guilty of capital murder. The general verdict did not specify which prosecutorial theory swayed the jurors.[6]

After a Texas jury has convicted a capital defendant, state law determines his sentence through answers to special issue questions. In this case, the trial court's instructions required the jury to decide whether (1) Sorto would be a future societal danger; (2) Sorto caused the two killings or anticipated that a human life would be taken; and (3) sufficient circumstances mitigated against the imposition of a death sentence. Clerk's Record at 406–10. Both of the parties presented extensive evidence in the sentencing phase. The State's numerous witnesses described Sorto's lengthy and violent criminal record. The defense called several witnesses to provide insight into Sorto's life and to humanize him. The jury answered Texas' special issues in a manner requiring the imposition of a death sentence.

Sorto raised sixteen claims on automatic direct appeal. The Texas Court of Criminal Appeals affirmed his conviction and sentence in a published opinion. *Sorto*, 173 S.W.3d at 492.

During the pendency of his direct appeal, Sorto raised fifteen claims in a state habeas application filed pursuant to Article 11.071 of the Texas Code of Criminal Procedure. State Habeas Record at 2–98.[7] Sorto subsequently filed a *pro se* "Motion to Amend Petition for State Habeas Corpus 11.071," alleging that intellectual disability barred his execution under *Atkins v.*

---

[6] The jury's general verdict meant that the jury could have based Sorto's conviction on any of the three theories. *See Fuller v. State*, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992) ("It is well-settled that when a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted the verdict will be upheld."); *see also Turner v. United States*, 396 U.S. 398, 420 (1970) ("The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged.").

[7] Sorto has filed several state habeas applications. The Court will refer to this application as the "2005 state habeas application."

7

*Virginia*, 536 U.S. 304 (2002).  State Habeas Record at 146–50.[8]  The State filed a response and the parties drafted proposed findings and conclusions.  *Id.* at 106–44, 165–69, 183–87, 189–209. The trial judge adopted the State's proposed findings of fact and conclusions of law.  *Id.* at 189–209.  The state habeas court took no action on Sorto's 2006 *pro se* state habeas application, but forwarded it to the Court of Criminal Appeals.

The Court of Criminal Appeals addressed both habeas applications in a single order. With regard to the 2005 state habeas application, the Court of Criminal Appeals adopted the trial judge's findings and conclusions, and denied habeas relief.  *Ex parte Sorto*, Nos. WR-71,381–01 & -02, 2009 WL 483147, at *1 (Tex. Crim. App. Feb. 25, 2009).  Additionally, the Court of Criminal Appeals decided that Sorto's 2006 *pro se* state habeas application was a subsequent application and dismissed it "as an abuse of the writ" after concluding that it "fails to meet any of the exceptions provided for in Article 11.071, § 5 . . . ." *Id.*[9]

Sorto then filed a federal petition for a writ of habeas corpus raising the following claims:

1.   The trial court improperly admitted into evidence Sorto's statements to the police.

---

[8] The Court will refer to this application as the "2006 *pro se* state habeas application."

[9] Section 5(a) requires a Texas court to dismiss any successive application unless an inmate meets one of three exceptions:

(1)   the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2)   by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3)   by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial . . . .

Tex. Code Crim. Proc. art. 11.071 § 5(a).

2.      Intellectual disability precludes Sorto's execution under *Atkins v. Virginia*, 536 U.S. 304 (2002).

3.      The prosecution violated Sorto's Eighth and Fourteenth Amendment rights by relying on extraneous offenses in the guilt/innocence phase.

4.      Trial counsel provided ineffective representation in the preparation and presentation of mitigating evidence.

(Docket Entry No. 1.)

The Court stayed this action to allow Sorto to present any unexhausted issues to the state courts.  (Docket Entry No. 11.)  Sorto filed another state habeas application in state court on November 8, 2010.[10]  Sorto's 2010 state habeas application alleged that (1) the trial court erroneously admitted extraneous offense evidence in the guilt/innocence phase; (2) intellectual disability barred his execution; and (3) trial counsel provided ineffective assistance in the investigation and presentation of mitigating evidence.  Successive State Habeas Record at 1–173.  Pursuant to Texas Code of Criminal Procedure Article 11.071, § 5(b), the district court transferred his 2010 state habeas application to the Court of Criminal Appeals for a determination of whether he met the successive filing requirements.  The Court of Criminal Appeals issued a short order summarily dismissing Sorto's 2010 state habeas application on April 20, 2011.  *Ex parte Sorto*, No. WR-71,381–03, 2011 WL 1533377, at *1 (Tex. Crim. App. Apr. 20, 2011).

This Court then reopened the federal action.  (Docket Entry No. 14.)  Sorto amended his federal habeas petition.  (Docket Entry No. 15.)  The respondent moved for summary judgment and Sorto filed a reply.  (Docket Entry Nos. 19, 20.)  After the Court authorized testing to assess whether Sorto suffers from intellectual disability (Docket Entry No. 26), Sorto again amended

---

[10] The Court will refer to this habeas application as the "2010 state habeas application."

his petition (Docket Entry No. 31).  Respondent has filed a new answer (Docket Entry No. 36) and Sorto has filed a reply (Docket Entry No. 37).  A motion for the allocation of funds for additional intellectual-disability testing is pending.  (Docket Entry No. 41.)  This action is ripe for adjudication.

## LEGAL STANDARDS

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law."  *Harrington v. Richter*, 562 U.S. 86, 91 (2011).  Federal habeas corpus review provides an important, but limited, examination of state criminal judgments.  Because "state courts are the principal forum for asserting constitutional challenges to state convictions," *id.* at 103, concerns for comity, federalism, and finality define the contours of federal habeas review.  *See Calderon v. Thompson*, 523 U.S. 538, 555–56 (1998); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Accordingly, federal jurisprudence sets procedural hurdles to federal habeas review.  Federal courts have long required inmates to give state courts the first chance to rectify constitutional violations.  *See Ex parte Royall*, 117 U.S. 241, 251–52 (1886).  To avoid the "unseem[liness] of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (internal quotation marks omitted), the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") requires an inmate to raise his federal claims in the highest state court before habeas relief becomes available.  *See* 28 U.S.C. 2254(b)(1).[11]  The procedural default doctrine, which functions as a "corollary to the habeas statute's exhaustion requirement," also constricts the scope of federal habeas review.  *Dretke v.*

---

[11] AEDPA precludes federal review over unexhausted claims for any purpose other than to deny their merits.  *See* 28 U.S.C. § 2254(b)(2).

*Haley*, 541 U.S. 386, 392–93 (2004).  Under "the doctrine of procedural default . . . a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1316 (2012); *see also Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  In the case of procedural default, however, the bar to federal review may be lifted "if the prisoner can demonstrate cause for the [procedural] default [in state court] and actual prejudice as a result of the alleged violation of federal law." *Maples v. Thomas*, ___ U.S. ___, 132 S. Ct. 912, 922 (2012) (internal quotation marks omitted) (alterations in original).  Respondent argues that the operation of Texas state law prevents this Court from adjudicating Sorto's second, third, and fourth federal claims.

If an inmate has presented his claims in a manner allowing the state courts to resolve their merits, AEDPA provides for a forgiving federal review.  AEDPA "bars relitigation of any claim adjudicated on the merits in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Richter*, 562 U.S. at 98 (internal quotation marks omitted).  Under those provisions, "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, 560 U.S. 370, 378 (2010) (quoting 28 U.S.C. § 2254(d)(1)).[12]  "The question under [§ 2254(d)] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable— a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also*

_____

[12] The Supreme Court has clarified that relief lies under § 2254(d)(1) if (1) "the state court arrives at a conclusion opposite to that reached by this Court on a question of law," (2) "the state court decides a case differently than this Court has on a set of materially indistinguishable facts"; or (3) "the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

*Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002).  Simply put, AEDPA "prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010).  Federal courts also generally presume that the state courts have made correct factual findings.  *See* 28 U.S.C. § 2254(e)(1).

This deference also limits a federal habeas court's ability to allow new factual development.  *See* 28 U.S.C. § 2254(e)(2).  The Supreme Court has "emphasize[d] that review under § 2254(d)(1) focuses on what a state court knew and did."  *Cullen v. Pinholster*, 563 U.S. 170, ___, 131 S. Ct. 1388, 1399 (2011).  Reasoning that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," *Pinholster* explicitly held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  *Id.* at 1399, 1400.  Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review" and this Court's review "is limited to the record in existence at [the time of the state court decision] *i.e.*, the record before the state court."  *Id.* at 1398, 1400; *see also Bobby v. Dixon*, ___ U.S. ___, 132 S. Ct. 26, 27 (2011).

With those standards in mind, the Court turns to Sorto's federal claims.

## ANALYSIS

### I.    Sorto's Statements to the Police

Sorto argues that the introduction into evidence of statements he made to the police violated his rights under the Fifth and Fourteenth Amendments.  As discussed at greater length below, Sorto claims that the trial court should have suppressed statements he made before the

police warned him of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). He also argues that the statements he gave after receiving the *Miranda* warnings were inadmissible because they violated *Missouri v. Seibert*, 542 U.S. 600 (2004).   Respondent counters that the state courts reasonably rejected his *Miranda* and *Seibert* arguments, both on direct appeal and on state habeas review.

### A.   The Timeline

At approximately 7:45 p.m. on August 20, 2002, Deputy Gonzalez and Detective Ortiz met Sorto and a confidential informant in a hotel room.  Tr. Vol. 24 at 11–13.  Sorto told the police officers that, although he was not a participant in the events, he had seen Edgardo Cubas and Eduardo Navarro kidnap, transport, and murder the two victims.  Tr. Vol. 28 at 23–26.  Detective Ortiz then asked the confidential informant and Sorto to make a formal statement at the homicide division.  Tr. Vol. 24 at 16–18; Tr. Vol. 28 at 43–44, 54–56.  The police and Sorto traveled to the Harris County Sheriff's homicide office in separate vehicles.  Tr. Vol. 24 at 16–17; Tr. Vol. 28 at 58.  A series of interviews followed from which the State would present five videotaped statements at trial.

Sorto and the informant arrived at the police station at around 9:45 p.m., and briefly sat in the waiting area in the homicide bureau while Detective Ortiz spoke with Detective Curtis Brown.  Tr. Vol. 24 at 19.  During this time, Sorto was not handcuffed, and no officer was assigned to watch him.  *Id.* at 19.  Shortly thereafter, Detective Ortiz took Sorto to an interview room.  *Id.* at 20.  At 9:52 p.m., Sorto began giving a videotaped statement to Detective Ortiz and Detective Brown.  *Id.* at 20–21.  The police did not give Sorto any *Miranda* warning before asking him questions.

Over approximately the next hour, the police officers questioned Sorto about the murders. *See generally* Tr. Vol. 41, State's Ex. 1A.   When Detective Brown spoke, Officer Ortiz translated.  Tr. Vol. 24 at 27.  Sorto again said that he had seen Cubas and Navarro commit the sexual assaults and killings from a distance.  Tr. Vol. 41, State's Ex. 1A at 5–23.  His statements disclaimed any direct responsibility for the murders.  *See generally id.*

At 10:48 p.m., Detective Ortiz asked Sorto to provide an oral swab to the police.  *Id.* at 39–40.  Sorto, who was "stunned," asked the police: "What is this exam?  Is it pretty good, 100 percent or what?"  Tr. Vol. 34 at 61; Tr. Vol. 29 at 10; Tr. Vol. 41, State's Ex. 1A at 42.  The police took an oral swab from Sorto.  Tr. Vol. 41, State's Ex. 1A at 40–41.  He thereafter began to "change the story," no longer describing himself as merely an eyewitness.  Tr. Vol. 24 at 56–57.  Sorto told the police that, after the murders, Cubas took him to the crime scene and forced him to have sex with one of the corpses.  Tr. Vol. 41, State's Ex. 1A at 49–52.  As Sorto began to talk after the oral swab, the police did not deliver a *Miranda* warning.  *See* Tr. Vol. 41, State's Ex. 1A at 41–43.  Sorto contends that, certainly, after the police obtained an oral swab, "[he] was in custody for purposes of *Miranda*." (Docket Entry No. 31 at 45.)  The trial court found that the portion of the interview after the oral swab was taken was not a custodial interrogation.  Tr. Vol. 25 at 70–71.

At around 11:21 p.m., the police read Sorto the *Miranda* warnings in Spanish, even though they still did not consider him to be in custody.  Tr. Vol. 29 at 13.  Over the next several hours, he gave the police statements admitting to his involvement in several crimes, only some of which came before the jury.

Detective Ortiz took Sorto to his cubicle and typed a written confession in Spanish from 11:37 p.m. until 1:10 a.m.  Tr. Vol. 24 at 32–33.  The State did not introduce that written

14

statement into evidence.  The police continued to interrogate Sorto throughout the early morning hours of August 21, 2002.  At around 1:10 a.m. the following morning, the police learned that Sorto had an outstanding warrant for his arrest.  Tr. Vol. 24 at 31–32.  The police then formally took him into custody.  *Id.* at 33.

At around 2:00 a.m., the police took Sorto to show them where Cubas and Navarro lived. *Id.* at 33.  After returning an hour later, Detectives Jesus Sosa and Heraclio Chavez began interviewing Sorto.  Tr. Vol. 29 at 58–60; Tr. Vol. 32 at 58–63.  Because "[h]e had already been read his rights," Tr. Vol. 24 at 114, Officer Sosa did not deliver any warnings.  Tr. Vol. 25 at 71. For the next two hours, the police "went over [the] statement [Sorto] had already given [after Detective Ortiz had] read him his rights . . . ."  Tr. Vol. 24 at 114.  The substance of that interview did not come before the jury.  A judge signed an arrest warrant at 5:33 a.m.  Tr. Vol. 28 at 17.  The police brought Sorto in front of a magistrate judge at 7:30 a.m.  An interpreter translated the statutory warnings into Spanish for Sorto.  *Id.* at 18.  The police then took Sorto to the Houston Police Department Offices for continued interview.  *Id.* at 18–19.

At about 8:25 a.m., police officers began interviewing Sorto again.  Tr. Vol. 24 at 98. The police first read Sorto his *Miranda* rights before beginning the audiotaped interchange.  *Id.* at 98–99; Tr. Vol. 41, State's Ex. 5B at 1–3.  The police questioned Sorto about the murder of Ms. Capulin and Ms. Rangel.  Sorto admitted to having sexually assaulted Ms. Rangel while she was alive, but said that he left before Cubas killed the two women.  Tr. Vol. 41, State's Ex. 5B at 32–45.  This statement was introduced in the guilt/innocence phase of the trial.

Throughout the remainder of that day, police officers interviewed Sorto about his involvement in several crimes, many of which involved his co-defendant Cubas.  The police repeatedly gave Sorto his *Miranda* warnings.  *See*, *e.g.*, Tr. Vol. 24 at 102–103; Tr. Vol. 42,

State's Ex. 6A at 1–3; Tr. Vol. 42, State's Ex. 7A at 3–4; Tr. Vol. 42, State's Ex. 8A at 1.

Among other issues, Sorto discussed the murder of fifteen-year-old Esmeralda Alvarado. Tr.

Vol. 42, State's Ex. 6A. Specifically, he admitted that he and Cubas kidnapped and raped Ms.

Alvarado, though he again represented that he was a mere witness to her murder. Tr. Vol. 42,

State's Ex. 6A at 24–37. This confession was introduced in the guilt/innocence phase of the

trial. Sorto also described several robberies, one of which ended in a shooting. *See* Tr. Vol. 35

at 115, 149; *see generally* Tr. Vol. 42, State's Exhibits 7, 8. In the sentencing phase, the

prosecution admitted into evidence Sorto's statements detailing these other offenses.

Sorto here claims that the state court erred in finding that the portion of the first

videotaped interview following the oral swab was not a custodial interrogation needing a

*Miranda* warning. He also alleges that, because the police deliberately secured his confession

prior to administering the *Miranda* warnings, the trial court should have suppressed the

subsequent statements under the rule established in *Seibert*. As discussed below, however, Sorto

has not shown that the state court's rejection of this claim was contrary to, or an unreasonable

application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### B.     *Miranda*

"In *Miranda v. Arizona*, the Court determined that the Fifth and Fourteenth Amendments'

prohibition against compelled self-incrimination required that custodial interrogation be

preceded by advice to the putative defendant that he has the right to remain silent and also the

right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481–82 (1981).

*Miranda*'s protections come into play during "questioning initiated by law enforcement officers

after a person has been taken into custody or otherwise deprived of his freedom of action in any

significant way." *Miranda*, 384 U.S. at 458.  The parties dispute whether Sorto was in custody before the police officers delivered the *Miranda* warnings at 11:21 p.m.

In *Miranda* case law, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."  *Howes v. Fields*, ___ U.S. ___, 132 S. Ct. 1181, 1189 (2012).  The Supreme Court has repeatedly emphasized the objective inquiry used to determine whether the police subjected the defendant to a custodial interrogation:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation;  and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: [was] there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted) (internal quotation marks omitted) (alteration in original); *see also J.D.B. v. N. Carolina*, ___ U.S. ___, 131 S. Ct. 2394, 2402 (2011).  Looking at "the objective circumstances of the interrogation," *Stansbury v. California*, 511 U.S. 318, 322–23 (1994), courts must assess whether a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112; *see also United States v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010) ("The Court examines how the reasonable man in the suspect's position would have understood the situation.").  Factors relevant to this analysis "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. . . ." *Fields*, 132 S. Ct. at 1189 (citations omitted).

This Court must decide whether the circumstances of Sorto's interrogation gave rise to "the coercive pressure that *Miranda* was designed to guard against."  *Maryland v. Shatzer*, 559

17

U.S. 98, 112 (2010).  Although Sorto does not contend that custodial interrogation began before the oral swab, he does identify several allegedly coercive factors that were present throughout the interview from 9:52 p.m. to 11:21 p.m.  (Docket Entry No. 31 at 31–32.)  Specifically, he states that the police took him to a small interview room.  Tr. Vol. 24 at 55; Tr. Vol. 25 at 12; Tr. Vol. 28 at 61.  One of the officers sat between Sorto and the door, and the door remained closed, but unlocked, during much of the interview.  Tr. Vol. 24, at 30, 55; Tr. Vol. 28 at 32.  One officer translated the other's questions and Sorto's answers, but also asked questions of Sorto; Sorto argues that this blurred role of interpreter and interrogator allegedly enhanced the coercive potential in the police interview.  (Docket Entry No. 31 at 32–36.)  Sorto also indicated that he did not feel as though he could leave because Detective Ortiz talked to him "very harshly."  Tr. Vol. 24 at 177.

Sorto sees the DNA sample as the pivotal factor that conclusively turned the interview into a custodial interrogation.  (Docket Entry No. 31 at 35–36.)  Sorto relies on the following testimony from the suppression hearing to show that his status changed at that point:

> Trial counsel: Okay. And when he changed the story, you knew he was a suspect?
>
> Officer Ortiz: He changed his story, yes.
>
> Trial counsel:  And he was going to be a defendant now, right, not a witness, in your mind?
>
> Officer Ortiz: Yes.
>
> Trial counsel:  Okay. At that point in time, did you read Mr. Sorto his rights?
>
> Officer Ortiz: No, sir.
>
> Trial counsel: And Mr. Sorto wasn't going anyplace after that swab, after he changed his story, right?

18

Officer Ortiz: He could have left if he wanted to.

Tr. Vol. 24 at 57.  Sorto argues, "[c]ertainly, by that point, [he] was in custody for purposes of *Miranda*." (Docket Entry No. 31 at 45.)  He points out that, in fact, he tried to leave several times after, and was thwarted by the police.  Sorto's federal petition describes how Detective Ortiz told him to wait when he tried to exit:

> [A]fter Ortiz takes Sorto's oral swab, Sorto begins to walk out of the interview room.  Sorto tries to leave a second time and is instructed to wait.  This time, Detective Brown remains in the room with Sorto.  As transcribed, Ortiz states after getting the oral swab, "Alright, let me, let me secure this . . . and . . . give me a second."  Detective Brown closes the door behind Ortiz, and remains in the room with Petitioner, who remains standing.  Brown asks Sorto if he understands English.  Sorto begins to say that he needs to pick up his wife: "Man, I told my wife, pick up 10:30."  Brown asks a few questions about Sorto's wife, then leaves Sorto in the interview room, closing the door behind him.

(Docket Entry No. 31 at 36–37, n.13 (citations omitted).)

Sorto's suppression hearing testimony also indicates that he tried to leave several times.  Tr. Vol. 24 at 177–79.  Sorto testified that, at one point, when he was left alone in the room and attempted to leave to use the restroom, Detective Ortiz, who was outside the interview room, grabbed Sorto by the hand, and another officer followed behind, escorting Sorto to the bathroom.  *Id.* at 177–78.  Sorto also testified that an officer told him he could not go when he tried to leave the police station after the oral swab.  *Id.* at 178–79.  If true, these facts would constitute some evidence of objective circumstances that may have led a reasonable person to believe that he was not free to leave.

However, the state court was also presented with evidence that Sorto made his statements voluntarily and in a noncoercive atmosphere.  Detective Ortiz explained that Sorto came to the homicide office on his own and without pressure.  Tr. Vol. 24 at 17–18.  Throughout the numerous interviews that night and the following morning, the police never handcuffed Sorto.

19

Tr. Vol. 24 at 19, 30–31, 98, 101, 148, 197.[13]   Detective Ortiz testified that he never told Sorto that he could not leave.  Tr. Vol. 25 at 6–7.  The officers never locked the door to the interview room, even when they left Sorto inside alone.  Tr. Vol. 24 at 30.  Once, when Officer Ortiz left the room, Sorto followed him.  *Id.* at 28.  Sorto stepped out of the room two or three times, once actually leaving the homicide office to use the restroom unsupervised.  *Id.* at 27–32.  Detective Ortiz testified that he never grabbed Sorto by the arm, and denied that he and another officer escorted Sorto to the bathroom.  Tr. Vol. 25 at 6–7.  Even though Detective Ortiz once told Sorto to "wait a second" when he got up to leave, *id.* at 11, Detective Ortiz testified that throughout the interview "[i]f he decided to leave, he was free to go."  Tr. Vol. 24 at 55.

The trial court found that Sorto "was not in custody" during the interview from 9:52 p.m. to 11:21 p.m. on August 20, 2002 and that the interview was "was not [a] custodial interrogation."  Tr. Vol. 25 at 71.[14]  The trial court also found that Sorto "gave [his] statement freely and voluntarily."  Tr. Vol. 25 at 71.  The appellate and habeas courts denied challenges to the admissibility of Sorto's police statements.[15]

---

[13] Sorto was handcuffed while in transit at various times during the morning of August 21, 2002.  Tr. Vol. 24 at 33, 118, 146.

[14] What the trial judge calls "videotape No. 1" at the suppression hearing refers to State's Exhibit 1, which includes the videotape and transcript of the interview from 9:52 to 11:21 p.m.  Tr. Vol. 24 at 22–24, 35.

[15] On direct appeal, Sorto faulted the trial court for not instructing the jury to determine the admissibility of his statements because he had "raised a fact issue as to whether his statements were legally obtained by presenting evidence that he lacked education, he had 'trouble with the language,' and '[h]e was not a native of this country and had no reason to understand the many rights he was spoken to about.'"  *Sorto v. State*, 173 S.W.3d 469, 488 (Tex. Crim. App. 2005).  His appellate claim focused on the statements he made after the *Miranda* warning.  *See id.* at 488, 89.  The claim Sorto raised in his 2005 state habeas application focused on "the later half of the first station house interview [which] was, in reality, a custodial interrogation" because "the setting and circumstances were such that even an average American citizen would have felt that he was being held . . . ."  State Habeas Record at 52.  In rejecting this claim, the state habeas court endorsed the trial court's findings from the suppression hearing.  *Sorto*, 2009 WL 483147, at *1.  Sorto must show that the state courts' rejection of his *Miranda* claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

The state court's rejection of Sorto's *Miranda* claim was not unreasonable.  "The custody inquiry is 'often a matter of shades and degrees,' requiring 'a number of fact-intensive, close calls.'"  *Morris v. Thaler*, 425 F. App'x 415, 421 (5th Cir. 2011) (quoting *Keohane*, 516 U.S. at 118 (Thomas, J., dissenting)).  Sorto voluntarily met with the police, and subsequently agreed to drive himself to the police station and provide a statement.  Sorto's first interview thus began simply as a witness statement.  He described how he had seen Cubas rape and kill two women, avoiding any mention of his own complicity.

Even after the oral swab was taken, the state court was justified in finding that Sorto was not in custody.  The Supreme Court has recognized that an individual is not necessarily in custody for purposes of receiving *Miranda* warnings even when the individual is the focus of the investigation.  *Stansbury*, 511 U.S. at 323.  Furthermore, the testimony of Detective Ortiz and other police officers at the suppression hearing indicated that Sorto was never told he could not leave, he was able to leave the room and go to the bathroom unsupervised, and officers never grabbed him or followed him.  Tr. Vol. 24 at 27–32; Tr. Vol. 25 at 6–7.

Sorto disputed some of the officers' testimony at the suppression hearing.  Tr. Vol. 24 at 177–79.  However, "subsidiary questions, such as the length and circumstances of the interrogation, . . . often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record . . . ."  *Miller v. Fenton*, 474 U.S. 104, 117 (1985) (pre-AEDPA).[16]  Although the state court record of the suppression hearing does not contain explicit

---

[16] While subsidiary factual findings are entitled to deference under 28 U.S.C. §2254(d)(2), federal courts review the ultimate determination of whether a defendant was in custody based on the totality of the factual circumstances that existed at the time of the interrogation as a legal issue under § 2254(d)(1).  *See generally*

determinations of credibility, "deference extends not only to express findings of fact, but the implicit findings of the state court." *Garcia v. Quarterman*, 454 F.3d 441, 444–45 (5th Cir. 2006).

In light of the evidence, the Court concludes that the state trial court was not unreasonable in implicitly finding credible the testimony of Detective Ortiz and numerous other police officers; the state court was not obligated to credit Sorto's version of the facts.  Even if the police had once told Sorto to wait when he wanted to leave, that does not transform the scenario into a custodial interrogation.  In light of record evidence suggesting Sorto's voluntary presence at the police station and the absence of physical restraints during the interview, the mere existence of *some* facts pointing in the opposite direction does not render the state court's *Miranda* determination unreasonable.  *Yarborough v. Alvarado*, 541 U.S. 652, 664–66 (2004).

As the Supreme Court recently reminded, federal habeas relief is available only when "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Dixon*, 132 S. Ct. at 27.  Sorto, therefore, has not shown that the state court's rejection of his *Miranda* claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  Although this Court would have reached a different conclusion from that of the state courts, that is not the appropriate test.

### C.    *Seibert*

Sorto also argues that his statements were inadmissible under *Missouri v. Seibert*, 542 U.S. 610 (2004).  In *Seibert*, the police diluted the effect of *Miranda* warnings through a two-step strategy: a detective exhaustively questioned the suspect until securing a confession and

---

*Yarborough v. Alvarado*, 541 U.S. 662, 663–64 (2004).

then, after a brief break, delivered the *Miranda* warnings and had the suspect repeat the earlier confession.  In sum, *Seibert* addressed a specific concern: "the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession."  542 U.S. at 609; *see also United States v. Montalvo-Rangel*, 437 F. App'x 316, 319 (5th Cir. 2011) (stating that *Seibert* condemned a "question first" police tactic, "a strategy by which officials interrogate an individual without administering a *Miranda* warning, obtain an admission, administer a *Miranda* warning, and then obtain the same admission again").  Sorto claims that the police interviewed him until he inculpated himself, and only then warned him of his constitutional rights.

Under section 2254(d), Sorto must show that the state courts misapplied "clearly established Federal law."  The parties debate what legal rule from *Seibert* should govern this claim.  The *Seibert* court issued a plurality opinion, with a determinative concurrence by Justice Kennedy.  The plurality decision asked whether "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again."  *Seibert*, 542 U.S. at 613. The plurality was concerned with whether the midstream warning "could function 'effectively' as *Miranda* requires."  *Id.* at 611–12.  Justice Kennedy's concurrence, however, focused on whether law enforcement officers used a "*deliberate* two-step strategy" in "a calculated way to undermine the *Miranda* warning."  *Id.* at 622 (emphasis added).

Sorto premises his argument on Justice Kennedy's approach being clearly established law.  (Docket Entry No. 31 at 41.)  Respondent points out that courts are split as to whether Justice Kennedy's approach or the plurality's is clearly established law, and argues that, in any event, Sorto's claim fails under Justice Kennedy's approach.  (Docket Entry No. 36 at 43.)  A

23

split currently exists among the circuit courts over which test governs.  *Compare United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010) (observing that the Second, Third, Fifth, Ninth, and Eleventh Circuits apply Justice Kennedy's approach in *Seibert*) *with United States v. Heron*, 564 F.3d 879, 884–85 (7th Cir. 2009) (finding that Justice Kennedy's concurrence is not controlling).

Regardless of which test applies, *Seibert* only comes into play if the police secured an initial confession during a custodial interrogation.  The Court has already found that the state courts were not unreasonable in concluding that the initial questioning of Sorto was not a custodial interrogation.  When an inmate's "initial, oral statements, which were obtained during police questioning without *Miranda* warnings, were given in a non-custodial situation, then neither *Miranda* nor *Seibert* require[s] the suppression of those statements" or the statements made after *Miranda* warnings were provided.  *Swain v. Thaler*, 466 F. App'x 393, 398 (5th Cir. 2012); *see also United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006) ("*Seibert* only applies if the first statements were obtained in violation of *Miranda*.").  Because Sorto has not shown that his initial statements were made during a custodial interrogation, he has not met the underlying predicate of a *Seibert* challenge.

The circumstances of Sorto's interrogations would not require habeas relief even if his initial confession had been obtained during a custodial interrogation.  Under Justice Kennedy's approach, *Seibert* only applies when the police have deliberately used the "question first" procedure.  *See United States v. Green*, 388 F. App'x 375, 380–81 (5th Cir. 2010); *United States v. Nunez-Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007).  Here, Sorto has not shown that the police intended to employ a two-step circumvention of *Miranda*'s dictates.  Instead, the record shows that the *Miranda* warnings came within the incipient steps of an evolving interview. Additionally, *Bobby v. Dixon*, ___ U.S. ___, 132 S. Ct. 26 (2011), a recent Supreme Court

24

decision discussing *Seibert*, also mandates rejection of Sorto's *Seibert* claim.  Without explicitly adopting either the plurality or concurring tests, the *Dixon* Court identified factors which warranted rejection of a *Seibert* claim.  Two factors discussed in *Dixon* require the denial of relief in this case.

First, the unwarned statements made by the suspect in *Seibert* "left 'little, if anything, of incriminating potential left unsaid,' making it 'unnatural' not to 'repeat at the second stage what had been said before.'"  *Dixon*, 132 S. Ct. at 31 (quoting *Seibert*, 542 U.S. at 616–617 (plurality opinion)).  In *Dixon*, however, the defendant "contradicted his prior unwarned statements when he confessed to [the] murder."  132 S. Ct. at 31.  Similarly, prior to the *Miranda* warnings, Sorto had conceded culpability for a crime much different from the one to which he later confessed.  In his unwarned statements, Sorto first painted his role as being that of a witness.  Tr. Vol. 41, State's Ex. 1A at 5–23.  Later in the interview, he claimed that Cubas forced him to engage in sexual activity with Ms. Rangel after she had died. Tr. Vol. 41, State's Ex. 1A at 49–52.  Sorto confessed to raping Ms. Rangel only after he received numerous *Miranda* warnings.  *See* Tr. Vol. 41, State's Ex. 5B at 32–45.  Here, "[u]nlike in *Seibert*, there is no concern . . . that police gave [the defendant] *Miranda* warnings and then led him to repeat an earlier [] confession, because there was no earlier confession to repeat.  Indeed, [the defendant] contradicted his prior unwarned statements when he confessed . . . ."  *Dixon*, 132 S. Ct. at 31.

Additionally, hours passed between Sorto's unwarned statements and his confession to the rape of Ms. Rangel.  *See supra* Part I.A.  During that time, the police advised Sorto of his rights several times, as did a state judicial officer.  Tr. Vol. 28 at 17–18; Tr. Vol. 29 at 13; Tr. Vol. 41, State's Ex. 5B at 1–3.  Under *Seibert*, a "significant break in time and dramatic change in circumstances create[] 'a new and distinct experience,' ensuring that [a defendant's] prior,

unwarned interrogation [does] not undermine the effectiveness of the *Miranda* warnings he receive[s] . . . ." *Dixon*, 132 S. Ct. at 32. *Dixon*, therefore, suggests that Sorto cannot make a viable *Seibert* challenge to the admission of his rape confession based on the significant break in time separating his initial unwarned confession and his subsequent warned confession.[17]

Sorto has not shown that the circumstances present in his case were reasonably similar to those condemned by the *Seibert* Court. Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## II.   **Intellectual Disability**

Sorto argues that the Eighth Amendment bars his execution because he is intellectually disabled. The Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002) held that "death is not a suitable punishment for [an intellectually disabled] criminal." *Id.* at 321. The *Atkins* Court relied on standards provided by the psychological profession to define intellectual disability:

> [Intellectual disability] refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. [Intellectual disability] manifests before age 18.

*Atkins*, 536 U.S. at 308 n.3 (quoting American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992) ("AAMR 9th")).[18] From this definition, courts have distilled three indispensable criteria for arriving at a

---

[17] The Court acknowledges that, in some ways, the circumstances in *Dixon* may evince a more significant break. For instance, during the four hours between his unwarned and subsequent warned confession, Dixon conferred with his lawyer and learned that police had gathered other evidence from an accomplice. *Dixon*, 132 S. Ct. at 32. Here, of course, Sorto did not confer with a lawyer between his unwarned and warned confessions. However, more than eight hours passed, Sorto appeared before a magistrate judge, and he received numerous *Miranda* warnings from the judge and from the police during the period between the unwarned and warned confessions. The Court concludes that this break is sufficiently significant to render unviable Sorto's *Seibert* claim.

[18] Professional organizations previously used the term "mental retardation" when referring to those

diagnosis of intellectual disability: (1) significantly subaverage intellectual functioning; (2) related significant limitations in adaptive skill areas; and (3) manifestation of those limitations before age 18.  *See Lewis v. Quarterman*, 541 F.3d 280, 283 (5th Cir. 2008); *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006).  An inmate bears the burden of proof on his *Atkins* claim and must establish the existence of intellectual disability.  *See Ex parte Briseño*, 135 S.W.3d 1, 12 (Tex. Crim. App. 2004) (adopting a preponderance of the evidence burden of proof, to be borne by defendant, "in the context of determining [intellectual disability] in the habeas corpus setting where the inmate traditionally bears the burden of proof"); *see also Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000) (holding that a habeas petitioner generally has "[t]he burden of demonstrating that a constitutional violation occurred").  Sorto argues that he meets the tripartite standard, and thus is ineligible for execution.

Sorto first raised his *Atkins* claim in the 2006 *pro se* state habeas application, filed during the pendency of his 2005 state habeas application.  He again asserted an *Atkins* claim in his 2010 state habeas application. As previously discussed, an inmate may proceed on a successive habeas action under Texas Code of Criminal Procedure Article 11.071, § 5(a) only in precisely defined circumstances.  The Court of Criminal Appeals found that Sorto's *pro se* 2006 state habeas application was a successive pleading that "fail[ed] to meet any of the exceptions provided for in Article 11.071, § 5."  *Ex parte Sorto*, Nos. WR-71,381–01 & -02, 2009 WL 483147, at *1 (Tex. Crim. App. Feb. 25, 2009).  The Court of Criminal Appeals also summarily dismissed Sorto's 2010 state habeas application under Article 11.071, § 5:

---

suffering from the above-stated factors.  The Supreme Court also used the term mental retardation in the *Atkins* decision.  Recent cases, however, have adopted the psychological community's current use of the term "intellectual disability."  *See Brumfield v. Cain*, ___ U.S. ___, 135 S. Ct. 2269, 2274 n.1 (2015); *Hall v. Florida,* ___ U.S. ___, 134 S. Ct. 1986, 1992 (2014).

> We have reviewed this second subsequent application and find that [Sorto] has failed to make a threshold presentation of evidence that, if true, is sufficient to show that no rational factfinder would fail to find that he is [intellectually disabled]. *See Ex parte Blue*, 230 S.W.3d 151, 163 (Tex. Crim. App. 2007). Further, the application does not contain sufficient specific facts establishing that but for a violation of the United States Constitution, no rational juror would have answered one or more of the special issues in the State's favor. The application fails to meet the dictates of Article 11.071, § 5(a). Accordingly, the application is dismissed. Art. 11.071, § 5(c).

*Ex parte Sorto*, Nos. WR-71,381–03, 2011 WL 1533377, at *1 (Tex. Crim. App. Apr. 20, 2011).

Respondent previously argued that the Texas Court of Criminal Appeals' summary dismissal of those pleadings precludes federal habeas review. (Docket Entry No. 19 at 64–66.) The parties now agree that the Court of Criminal Appeals' decision was not a procedural determination that could bar federal adjudication.

The Texas Court of Criminal Appeals' dismissal of Sorto's *Atkins* claim as abuse of the writ—even though couched as a procedural ruling—is essentially a preliminary factual determination on the merits of his claim. Typically, under AEDPA, a state court's "determination of a factual issue . . . shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner may only rebut this "presumption of correctness by clear and convincing evidence." *Id.* Additionally, under AEDPA a federal court may grant habeas relief only if, "in light of the evidence presented in the State court proceeding," the state court's "determination of the facts" was "unreasonable." *Id.* § 2254(d)(2). These provisions, in combination, mandate that a reviewing federal court afford considerable deference to a state court's factual findings. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (stating that, under AEDPA, a federal court's review of a state court's factual finding does not evaluate whether the determination was "incorrect" but whether it was "unreasonable—a substantially higher threshold").

28

This deferential treatment is not required, however, if the state court violated due process by "dismiss[ing] a *prima facie* valid *Atkins* claim without having afforded the petitioner an adequate opportunity to develop the claim." *Blue*, 665 F.3d at 657. "[W]hen a petitioner makes a *prima facie* showing of intellectual disability, a state court's failure to provide him with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA." *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010); *see also Garcia v. Stephens*, 757 F.3d 220, 225 (5th Cir. 2014); *Ladd v. Stephens*, 748 F.3d 637, 644–45 (5th Cir. 2014); *Rivera*, 505 F.3d at 358. The state court's dismissal of a *prima facie* valid *Atkins* claim carries a second consequence as well: the reviewing federal court must allow the petitioner to develop the factual basis for his claim. *Blue*, 665 F.3d at 657.

As a result, before the Court can address the merits of Sorto's *Atkins* claim, it must first determine whether the Texas Court of Criminal Appeals violated Sorto's due process rights when it summarily dismissed his successive habeas petitions. This question "turns entirely on whether [Sorto's successive habeas petitions] made a *prima facie* showing of [intellectual disability]" under Texas law. *Blue*, 665 F.3d at 657; *see also Hines v. Thaler*, 456 F. App'x 357, 361 (5th Cir. 2011) (noting that, in a prior case before the Fifth Circuit, Mississippi's failure to provide an evidentiary hearing on a prisoner's *Atkins* claim had been a violation of due process because the prisoner had "satisfied the specific state law requirements for a *prima facie* case of [intellectual disability] under Mississippi law"). This inquiry necessarily involves only the evidence Sorto put before the state courts when attempting to make a *prima facie* showing of intellectual disability. *Blue*, 665 F.3d at 656 ("*Pinholster* prohibits a federal court from using evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d).").

29

A *prima facie* claim of intellectual disability under Texas law consists of: "'(1) significantly subaverage general intellectual functioning,' defined as an IQ of about 70 or below; '(2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18.'" *Blue*, 665 F.3d at 657–58 (quoting *Briseño*, 135 S.W.3d at 7).   For petitioners who omitted an available *Atkins* claim from their initial state habeas applications, as Sorto did, the Texas Court of Criminal Appeals requires a "threshold showing of evidence" that is "sufficient to support an ultimate conclusion, by clear and convincing evidence, that no rational factfinder would fail to find [intellectual disability]." *Blue*, 230 S.W.3d at 163.   For the reasons stated below, the Court concludes that Sorto did not present the Texas Court of Criminal Appeals with a *prima facie* valid claim of intellectual disability pursuant to the clear and convincing standard for a successive petition under Texas law.

### A.     The Evidence Sorto Presented to the State Courts

Before Sorto's 2006 *pro se* state habeas application, nothing in the record suggested that he would raise an *Atkins* claim.   At his trial, despite the fact that the Supreme Court had decided *Atkins* a year before, the defense did not emphasize Sorto's cognitive functioning.   This was true even though Sorto's trial counsel, in preparation of his mitigation defense, retained a Spanish-speaking psychologist, Dr. Rosin, to test Sorto for cognitive impairments approximately four months before trial.   Tr. Vol. 38 at 129–30, 166.   According to Sorto's 2010 state habeas application, Dr. Rosin administered the Wechsler Adult Intelligence Scale—Escala de Inteligencia para Adultos ("EIWA") to Sorto.   Successive State Habeas Record at 42, 88.   The record does not reveal Sorto's scores on the EIWA, although it is clear Dr. Rosin did not diagnose him with intellectual disability based on his performance.   Tr. Vol. 38 at 129–30, 166, 171–72.

Dr. Rosin was a consulting expert for Sorto's defense; she did not testify at trial. However, Sorto's testifying expert—Dr. Silverman—reviewed the EIWA results, in addition to conducting his own "mental status examination."  Tr. Vol. 38 at 129–30, 168.  Dr. Silverman testified during the sentencing phase that Sorto had "[m]aybe a little bit above" average intelligence. *Id*. at 168.  Dr. Silverman also did not diagnose Sorto as intellectually disabled. *Id*. at 129–30, 166, 171–72.

Upon Sorto's admission to the Polunsky Unit of the Texas Department of Criminal Justice ("TDCJ"), he was administered a test of non-verbal intelligence, the "TONI," by a TDCJ employee.[19]  Successive State Habeas Record at 34.  Sorto received a score of 66 on this test. *Id*.

Sorto first claimed to be intellectually disabled when he filed his 2006 *pro se* state habeas application—his second habeas application.  This application did not present any evidence to support a finding of intellectual disability, however; it simply noted the possibility that he was intellectually disabled and claimed: "A person thought to be a person with [intellectual disability] has the right promptly to receive a determination of [intellectual disability] . . . . [Sorto] must be tested by a psychologist licensed to practice in Texas to conduct a determination of [intellectual disability]."  State Habeas Record at 150–51.

---

[19] One court described the TONI-2 test as follows:

> **Test of Non-Verbal Intelligence-2** (TONI-2)—a language-free measure of abstract problem solving ability which may be used with individuals ages five through eighty-five years old.  It tests a non-verbal IQ.  Test items are presented in an easel-style picture book, and six training items precede the fifty-five actual items on both forms of the test.  The examiner will pantomime or act out instructions, and the examinee points or makes some other meaningful response to indicate his or her choice.  Problem types include simple matching, analogies, classification, intersections, and progressions.

*Simpson v. Quarterman*, 593 F. Supp. 2d 922, 943 (E.D. Tex. 2009).  It is not clear whether Sorto was administered the TONI-2 or TONI-3.  The record included references to the second and third editions of that testing instrument.  Successive State Habeas Record at 44, 89; Docket Entry No. 15–1 at 15; Docket Entry No. 19 at 78.  Because the parties have not suggested that any meaningful distinction exists between those two versions of the test, the Court will generally refer to the test as "TONI."

Sorto first developed the factual basis of his *Atkins* claim in his 2010 state habeas application—his third habeas application.  Sorto relied on three categories of information to meet *Atkins'* three-part test.  First, Sorto cited his score of 66 on the TONI, administered on death row, as "plac[ing] him well within the range of significantly subaverage intellectual functioning." Successive State Habeas Record at 44.  Second, Sorto submitted several affidavits from those who knew him as a youth.  These affidavits primarily describe his impaired intelligence as a child, though they also suggest that Sorto had difficulty working competently as an adult.  *Id*. at 91–143, 152–73.  Third, and most importantly, Sorto presented a declaration from Gilbert Martinez, a clinical psychologist.  *Id*. at 88–89.

Dr. Martinez did not interview Sorto or perform any psychological testing.  *Id.* at 88–89. Instead, Dr. Martinez reviewed the first two categories of information and gave his "professional opinion that Mr. Sorto's history contains significant indications of intellectual and adaptive deficits beginning in the developmental period prior to age 18."  *Id*. at 89.  Dr. Martinez acknowledged Sorto's "repeated[] exposure" to "several risk factors . . . commonly associated with [intellectual disability]," including poverty, abuse, exposure to pesticides, and inadequate family support.  *Id*. at 88.  He noted that Sorto's score on the TONI was in the "significantly subaverage intellectual range . . . ."  *Id*. at 89.  Dr. Martinez also observed: "Mr. Sorto had significant limitations in his conceptual, social, and practical skills before the age of eighteen. He had difficulties speaking, using money, grasping basic concepts, getting dressed properly, and [] was naive and gullible."  *Id*. at 89.  Dr. Martinez stopped short of diagnosing Sorto as intellectually disabled, however.  Instead, he acknowledged the need for more information: "A complete evaluation of Mr. Sorto, including interview and psychological testing with a

comprehensive assessment of his intellectual ability is required to make an appropriate diagnosis . . . ." *Id.* at 89.

### B.    Intellectual Functioning

The first prong of an *Atkins* claim is significantly subaverage general intellectual functions.  The psychological profession recognizes results from IQ testing as a key indicator of intellectual functioning.  However, the Court of Criminal Appeals has observed that "IQ tests differ in content and accuracy."  *Briseño*, 135 S.W.3d at 7 n.24.  Accordingly, under *Atkins*' first prong, Texas requires a *full-scale IQ* score from a test recognized by professional psychological organizations as an appropriate measure of intellectual functioning.  *See Maldonado v. Thaler* 625 F.3d 229, 240 (5th Cir. 2010) (*Maldonado II*); *Ex parte Hearn*, 310 S.W.3d 424, 431 (Tex. Crim. App. 2010).  "[U]nder Texas law, the lack of a full-scale IQ score of 75 or lower is fatal to an *Atkins* claim."  *Blue*, 665 F.3d at 658.

In Sorto's 2010 state habeas petition, the only IQ score presented to the Court of Criminal Appeals came from a TDCJ employee's administration of the TONI test upon Sorto's arrival at death row.  The TONI test is a screening tool used to arrive at a rough estimate of the subject's intellectual ability.  *See Maldonado II*, 625 F.3d at 240; *see also Moore v. Quarterman*, 342 F. App'x 65, 81 n.27 (5th Cir. 2009) (Smith, J., dissenting) (noting the "standard professional view" that the TONI is not a measure of general intelligence).[20]  Accordingly, federal and state courts have found that scores on the TONI alone do not satisfy *Atkins*' first prong—as experts proffered by petitioners have often themselves argued.  *See Guevara v. Stephens*, 577 F. App'x 364, 373

---

[20] In another case, Dr. Martinez described the TONI as "a 'screening tool designed to ascertain only a gross estimate of a subject's intellectual capabilities based upon a relatively brief evaluation process (about fifteen minutes) . . . [in contrast to] the much more sophisticated and comprehensive Wechsler Adult Intelligence Scale which . . . requires approximately ninety minutes to administer."  *Hernandez v. Thaler*, Civ. No. 08–805, 2011 WL 4437091, at *13 (W.D. Tex. Sept. 23, 2011).

(5th Cir. 2014); *Maldonado II*, 625 F.3d at 240–41; *Moore v. Quarterman*, 342 F. App'x at 81 n.27; *Hall v. Quarterman*, 534 F.3d 365, 376 (5th Cir. 2008); *Hernandez v. Thaler*, No. 08–805, 2012 WL 394597, at *15 (W.D. Tex. Feb. 6, 2012); *Maldonado v. Thaler*, 662 F. Supp. 2d 684, 721–22 (S.D. Tex. 2009) (*Maldonado I*); *Hall v. State*, 160 S.W.3d 24, 30, 33 (Tex. Crim. App. 2004).

Sorto himself concedes that the TONI only allows for "an approximation of the person's intellectual functioning." (Docket Entry No. 31 at 62.) Indeed, in his affidavit, Dr. Martinez did not treat the TONI score as a sufficient basis for *Atkins* relief on its own. Instead, he stated that "further testing is warranted to determine if Mr. Sorto is [an intellectually disabled] individual." Successive State Habeas Record at 89. A psychological opinion that additional testing may be necessary does not equate to "clear and convincing evidence" of "specific facts" sufficient to support a finding of significantly subaverage general intellectual functioning. *See Blue*, 230 S.W.3d at 166 (finding records of poor school performance and expert opinion that psychological testing for intellectual disability should be administered "fall[] short of evidence that could reasonably support a firm belief or conviction that the [petitioner] is [intellectually disabled]").

Dr. Martinez's affidavit also criticized the use of the EIWA test by Sorto's trial counsel and experts. Successive State Habeas Record at 88–89. The results of this test—administered by Dr. Rosin—were reviewed by Sorto's testifying expert, Dr. Silverman, and may have contributed to his conclusion that Sorto is of "a little bit above [average intelligence]."[21] Tr. Vol.

---

[21] It is impossible to determine how much Dr. Silverman was influenced by the EIWA results. He conducted his own "mental status examination" of Sorto, which he described as a "cognitive test." Tr. Vol. 38 at 168. He also testified that "standard psychological tests" were inappropriate for Sorto because they were not "standardized for his culture" and therefore likely would not be "accurate." *Id.* at 130. Although he did not expressly extend this criticism to the EIWA testing conducted by Dr. Rosin, the inference that he discounted those

38 at 166, 168.  Dr. Martinez claimed that Sorto's EIWA score was unreliable because that test regularly overestimated IQ scores by 20 to 25 points.  Successive State Habeas Record at 88. Even if Dr. Martinez's contention had been credited by the Court of Criminal Appeals, however, it could not have satisfied the requirement for a full-scale IQ score, because Sorto's 2010 state habeas application failed to indicate his score on the EIWA.  Clearly, the allegation that an IQ test overestimates IQ scores by 20 to 25 points cannot be used to benchmark a person's intellectual functioning if that individual's score on the test is withheld.

Two mental health experts retained by Sorto's trial counsel examined Sorto for cognitive defects; neither diagnosed him as intellectually disabled.  Tr. Vol. 38 at 171–72.  On successive state habeas review, the Court of Criminal Appeals had before it an affidavit from Sorto's own trial counsel explaining why the defense did not present extensive evidence of Sorto's childhood exposure to pesticides at the sentencing phase:

> [Sorto] showed no cognitive impairments, despite some testimony of his family that he had difficulty in the first grade.  He was clearly aware of his situation and able to assist us in his case, and provided us with a great deal of information that was helpful.  He was examined by our psychiatrist, who testified at his punishment phase, and who detected no real evidence of such impairment.

Successive State Habeas Record at 149.

In summary, Sorto's 2010 state habeas application relied on the result from one test—the TONI—which is not accepted as a valid measure of general intelligence by Texas state courts, and on criticism of another test—the EIWA—for which Sorto's score was not even provided. The application cited the opinion of one psychologist that further testing was needed to determine whether Sorto is intellectually disabled, while ignoring that two other mental status experts and Sorto's trial counsel had concluded that Sorto did not suffer from any cognitive

results is not unreasonable.

impairment.  This did not provide the Texas courts with sufficient evidence that, if true, would "support an ultimate conclusion, by clear and convincing evidence," that he suffered from significantly subaverage general intellectual functioning.  *Blue*, 230 S.W.3d at 163.

### C.    Significant Limitations in Adaptive Skill Areas

While Sorto's failure to provide clear and convincing evidence of subaverage intellectual functioning is determinative on the issue of whether the Texas Court of Criminal Appeals violated his right to due process, the Court will also address whether he met his burden pursuant to the second prong of the *Atkins* analysis. This prong involves an assessment of "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting."  *Wiley*, 625 F.3d at 216 (internal quotation marks omitted). Thus, psychology looks for deficits in "adaptive skills" in diagnosing intellectual disability. *Atkins*, 536 U.S. at 318.

The psychological profession defines adaptive deficits as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility."  *Maldonado II*, 625 F.3d at 241 (internal quotation marks omitted).  "The assessment of adaptive functioning deficits is no easy task."  *Wiley*, 625 F.3d at 217.  Accordingly, psychology contemplates that adaptive deficits "will be determined by clinical assessment and, usually, standardized scales."  *Maldonado II*, 625 F.3d at 241 (internal quotation marks omitted); *see also Briseño*, 135 S.W.3d at 7 n.25.

Dr. Martinez did not perform, and still has not performed, any standardized testing to assess Sorto's current or past adaptive skills.  He did not interview Sorto or his family.  Instead, he reviewed information in Sorto's federal petition for writ of habeas corpus, including affidavits

from Sorto's friends and family members (the "Habeas Affidavits").  Successive State Habeas Record at 88.  The Habeas Affidavits attested that Sorto was delayed in learning to walk and speak.  *See id*. at 91, 132.  He was not fully toilet-trained until he was five or six years old.  *See id*. at 93.  Speech impediments hampered his communication with others until his teenage years. *See id*. at 91, 101, 111, 153.  He was simpleminded, displaying difficulty with his memory and with learning new concepts.  *See id*. at 92, 101–02, 111, 120, 125, 135.  He was held behind in school for several years, and dropped out at age twelve without having progressed beyond second grade.  *See id*. at 111, 120, 153.  He could not count change or dress himself well.  *See id*. at 92, 101–02, 111.  Later in life, he had difficulty learning and remembering new skills or techniques at work.  *See id*. at 125, 135.

> Based on this information, Dr. Martinez concluded:
>
> Mr. Sorto had significant limitations in his conceptual, social, and practical skills before the age of eighteen.  He had difficulties speaking, using money, grasping basic concepts, getting dressed properly, and [] was very naive and gullible.
>
> . . . [I]t is my professional opinion that Mr. Sorto's history contains significant indications of intellectual and adaptive deficits beginning in the developmental period prior to age 18. . . .   [I]ndividuals who have known Mr. Sorto from childhood have provided a view of his life of seriously impaired functioning in a broad spectrum of daily living requirements.  Included in these impairments are deficits in Mr. Sorto's conceptual, practical, and social skills . . . .

Successive State Habeas Record at 89.

The Habeas Affidavits are sufficiently detailed and consistent to provide a glimpse of Sorto's childhood.  They indicate that Sorto suffered significant developmental delays in his formative years.  But the Court notes with dismay that Dr. Martinez never met with Sorto or the affiants.  His opinion that Sorto suffered from adaptive deficits carries less force as a result.  *See Blue*, 230 S.W.3d at 165, 167–68 (concluding that a petitioner who submitted affidavits

"provid[ing] sketchy, anecdotal evidence and opinions" of adaptive deficits, but failed to include "results from any of the available standardized scales for assessing adaptive deficits[,]" did not meet the clear and convincing standard for a successive petition).

The absence of a professional, individualized evaluation of Sorto's abilities is particularly troublesome in this case because the Habeas Affidavits contrast with other aspects of the record.[22]   *See Woods*, 296 S.W.3d at 606 (noting that "prior evidence" is "relevant to a determination of whether [the] applicant's current pleading meets the requirements of Article 11.071 § 5(a)(3)").   During the sentencing phase of Sorto's trial, several individuals—some of whom later authored the Habeas Affidavits—testified that Sorto maintained steady employment from a very young age.  Tr. Vol. 37 at 126–27; Tr. Vol. 38 at 92–93, 136–37, 179.  They testified that, after moving to Houston at age nineteen, he regularly sent money to his family in El Salvador.  Tr. Vol. 37 at 91–92; Tr. Vol. 38 at 220–21.  And they testified that he financially supported his own household in Houston, even during a brief separation from his wife.  Tr. Vol. 38 at 92–94, 136–37.   This testimony—which indicates that Sorto navigated his world competently as an adult—negates any suggestion that he suffers pervasive adaptive deficits.

Additionally, the portrait presented in the Habeas Affidavits is difficult to square with the manner in which Sorto participated in his own defense.  As noted above, the Court of Criminal Appeals had before it trial counsel's observation that Sorto displayed "no cognitive impairments" during the course of the representation; to the contrary, he was "aware of his situation," "able to

---

[22] This is not to say that the Habeas Affidavits find no support in the record.  During the sentencing phase of the trial, two individuals testified regarding Sorto's inability to advance in grade levels despite several years at school in El Salvador.  Tr. Vol. 37 at 116, 142.  Additionally, the fact that Sorto approached the police to provide information on a crime he himself committed is strong evidence of diminished mental capacity, particularly given how incompetently Sorto concealed his involvement in the crime.

assist [with] his case," and provided trial counsel "with a great deal of information that was helpful." Successive State Habeas Record at 149. Trial counsel's assessment of Sorto's capabilities was confirmed by two mental health experts retained for his defense, both of whom examined Sorto and failed to diagnose any intellectual disability. Tr. Vol. 38 at 171–72.

In his 2010 state habeas application, Sorto adduced some evidence suggesting developmental delay and mental impairment. But he offered no individualized, professional psychological assessment of his adaptive skills. Moreover, pursuant to Sorto's direct appeal and prior habeas action, the Court of Criminal Appeals had before it a broad range of information about Sorto. *See Woods*, 296 S.W.3d at 606; *see also Ex parte Campbell*, 226 S.W.3d at 423 (reviewing all record evidence under § 5(a)(1)). Some of that information was inconsistent with a finding of significant limitations in adaptive skill areas. Consequently, Sorto did not present a "threshold showing of evidence that would be at least sufficient to support an ultimate conclusion, by clear and convincing evidence," that he suffered adaptive deficits. *Blue*, 230 S.W.3d at 163.

### D.     Conclusion of *Prima Facie* Review

Sorto presented the state courts with some evidence that would support a psychological inquiry into possible intellectual disability. But he did not make a *prima facie* threshold showing of evidence that would support, by clear and convincing evidence, an ultimate conclusion for *Atkins* relief. Crucially, no mental-health expert had diagnosed Sorto with intellectual disability. While he has provided affidavits from family members and friends suggesting developmental delay and difficulty in practical life activities, this evidence was contradicted by other information in the record. In sum, his 2010 successive habeas petition, asserting a belated *Atkins*

claim, was not sufficient to make a *prima facie* case of intellectual disability under the standards established by the Texas Court of Criminal Appeals.  Because Sorto received the process he was due under Article 11.071, no further development of his *Atkins* claim in federal court is warranted, and the Court must review the reasonableness of the Court of Criminal Appeals' denial of successive habeas proceedings under the deferential standard imposed by AEDPA.

Whether Sorto is intellectually disabled "is a question of fact, reviewed under 28 U.S.C. § 2254(d)(2)."  *Hines*, 456 F. App'x at 364.  Relief is not available to Sorto under this section unless he shows that the state court adjudication of his *Atkins* claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  To make that showing, Sorto cannot merely demonstrate "that a state court's decision was incorrect or erroneous."  Instead, he "must show that the decision was objectively unreasonable, a substantially higher threshold."  *Blue*, 665 F.3d at 654–55 (internal quotation marks omitted).

Given the weaknesses in Sorto's *Atkins* claim as presented to the state courts, he cannot establish that the Court of Criminal Appeals' factual determination that he had failed to produce clear and convincing evidence of intellectual disability was objectively unreasonable.  He presented no full-scale IQ score falling in the range accepted by Texas state courts as indicative of "significantly subaverage general intellectual functioning."  He presented no clinical assessment of his adaptive functioning.  Anecdotal evidence of his developmental delays and lack of practical skills was contradicted by more recent evidence in the record regarding his self-sufficiency as an adult; his comprehension of the investigation and charges against him; and his ability to participate in and meaningfully contribute to his defense.  At best, Sorto raised the

40

specter that he may be mentally impaired.  But he did not put forth evidence that convincingly places him within the category of offenders *Atkins* meant to protect.[23]  The record produced to the Texas Court of Criminal Appeals does not entitle Sorto to federal habeas relief on his *Atkins* claim.

### E.   Federalism and the Testing During Federal Review

During the pendency of this action, the Court authorized testing for intellectual disability. Dr. Martinez interviewed Sorto in 2014 and administered a battery of psychological tests, including the Wechsler Adult Intelligence Scale—Third Edition (WAIS-III).  The results of Dr. Martinez's testing have resulted in a more robust showing of intellectual disability.  Sorto obtained a full-scale IQ score of 63 on the WAIS-III placing him within the range eligible for a diagnosis of intellectual disability.  Based on his testing and his review of the earlier-gathered material, Dr. Martinez opined that Sorto's scores "are within the Extremely Low range (formerly Mild Mental Retardation) and are highly consistent with scores obtained during nonverbal intelligence screening (TONI) in 2003."  (Docket Entry No. 31, Exhibit 2.)

The extent of Dr. Martinez's testing, however, did not provide a basis for a conclusive diagnosis of intellectual disability.  For reasons not readily apparent from the record, Dr. Martinez did not fully assess whether Sorto suffers from deficits in adaptive behavior or whether

---

[23] Sorto has recently argued that, because "the state court denied [him] funding necessary to establish his claim and prove his intellectual disability," the state court process "was clearly ineffective at safeguarding these rights and, as a result, Mr. Sorto is entitled to relief under 28 U.S.C. § 2254(b)(1)(B)(ii)."  (Docket Entry No. 41 at 10.)  Thus, this Court can "consider Mr. Sorto's claim regardless of whether it finds the claim to be exhausted." (Docket Entry No. 41 at 10–11.)  Section 2254(b)(1)(B)(ii) exempts a claim from the exhaustion requirements when "circumstances exist that render such process ineffective to protect the rights of the applicant."  This exemption, however, only applies when "there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief."  *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981).  Sorto's failure to put forth evidence sufficiently calling into doubt his intellectual ability, not the state court's failure to authorize the expenditure of funds, foreclosed state habeas review.  Sorto has not shown that the denial of funding made filing a successive state habeas application an illusory and futile process.

his deficiencies occurred before age 18.  Instead, Dr. Martinez reported that "[a] comprehensive adaptive functioning assessment is strongly recommended to confirm this diagnosis of intellectual disability."  (Docket Entry No. 31, Exhibit 2.)   Even without a full diagnosis of intellectual disability, Sorto asserts that "[a]llowing [him] to be executed despite the convincing evidence presented to this Court that he is intellectually disabled would be a fundamental miscarriage of justice."  (Docket Entry No. 37 at 19.)

The "backward-looking language" of AEDPA "requires an examination of the state-court decision at the time it was made."  *Pinholster*, 131 S. Ct. at 1398.  AEDPA codifies "Congress' intent to channel prisoners' claims first to the state courts."  *Id.* at 1399; *see also Jimenez v. Quarterman*, 555 U.S. 113, 121 (2009) (commenting on the "AEDPA's goal of promoting comity, finality, and federalism by giving state courts the first opportunity to review [a] claim, and to correct any constitutional violation in the first instance." (internal quotation marks omitted)); *Williams v. Taylor*, 529 U.S. 420, 437 (2000) ("Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." ).  With that understanding, "the record under [AEDPA] review is limited to . . . the record before the state court."  *Pinholster*, 131 S. Ct. at 1398.  Binding federal law constrains this Court from considering the results of Dr. Martinez's testing.

Sorto has filed a motion requesting additional funds to complete Dr. Martinez's testing for intellectual disability by performing additional inquiry into adaptive deficits.  (Docket Entry No. 41.)  "The granting of funds . . . is a discretionary decision to which [a petitioner] does not have a mandatory right."  *Smith v. Dretke*, 422 F.3d 269, 289 (5th Cir. 2005).  Federal law clarifies that a "court may authorize the defendant's attorneys to obtain [investigative or expert]

services on behalf of the defendant" only "[u]pon a finding that investigative, expert, or other services are *reasonably necessary* for the representation of the defendant[.]"   18 U.S.C.A. § 3599(f) (emphasis added).   Sorto has not provided any substantive basis to suppose that additional testing would provide any basis to allow federal review of his *Atkins* claim.   Testing is not reasonably necessary when it will only support a claim for which federal review is unavailable.   *See Wilkins v. Stephens*, 560 F. App'x 299, 315 (5th Cir. 2014); *Smith*, 422 F.3d at 288; *Turner v. Johnson*, 106 F.3d 1178, 1184 n.16 (5th Cir. 1997).

Sorto's new evidence certainly makes a stronger showing of intellectual disability than that which he presented to the state courts.   The Court observes, however, that Sorto's new evidence is compelling, but not conclusive.   Dr. Martinez's evaluation did not assess Sorto's adaptive behavior.   While on its face suggesting the presence of intellectual disability, Sorto's evidence has never been tried through the adversarial process.   Respondent makes cursory arguments to weaken the impact of the new evidence, but the circumstances have not given Respondent a fair opportunity to refute Dr. Martinez's testing.   Yet AEDPA also prohibits the Court from authorizing an evidentiary hearing to develop additional evidence.

Congress has created harsh barriers to federal habeas relief.   The relative merits of an inmate's arguments do not supersede Congress' sense of the balance between federalism and an individual's constitutional rights.   Because Sorto did not give the state courts an adequate basis to warrant additional inquiry, his production of new evidence on federal review cannot influence this Court's adjudication.   Sorto has not shown that the state court's rejection of his *Atkins* claim based on the evidence he presented there was contrary to, or an unreasonable application of,

federal law.  *See* 28 U.S.C. § 2254(d)(1).  The Court is not comfortable with this outcome, but the law is unambiguous.

## III.   Admission of an Extraneous Offense in the Guilt/Innocence Phase

Sorto claims that the State of Texas violated his constitutional rights under the Eighth and Fourteenth Amendments by introducing evidence of a separate murder in the guilt/innocence phase.  Specifically, the prosecution asked jurors to find Sorto guilty of intentional murder in this case because he had been with Cubas when Ms. Alvarado was raped and killed.  Respondent argues that Sorto defaulted this claim in state court.  The Court must first consider the procedural posture of this claim before addressing the merits.

### A.    Procedural Viability of Sorto's Second Ground for Relief

"[A]dequate and independent state law procedural grounds" can foreclose federal review. *Haley*, 541 U.S. at 392–93; *see also Coleman*, 501 U.S. at 729.  Sorto first raised this claim in his federal habeas petition.[24]  When the Court stayed this action, Sorto included this claim in his successive habeas application.  Sorto faced strict procedural hurdles to state consideration of this claim.  Under the Texas Code of Criminal Procedure Article 11.071, § 5, an inmate can proceed on a successive habeas action only if he shows applicable new law or facts (§ 5(a)(1)); actual innocence of his conviction (§ 5(a)(2)); or actual innocence of the death penalty (§ 5(a)(3)).  Without providing extensive argument, Sorto contended that both §§ 5(a)(1) and 5(a)(3)

---

[24] On direct appeal, Sorto had raised a similar claim under state law, but did not make any federal constitutional argument.  "[N]ot only must a petitioner present the state court with his claim, but he must also alert the state court of the constitutional nature of the claims."  *Neville v. Dretke*, 423 F.3d 474, 479 (5th Cir. 2005); *see also Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.").  A state court, when presented with a claim of error under state law, "understandably confine[s] its analysis to the application of state law."  *Henry*, 513 U.S. at 366.  Thus, "[m]ere similarity" between the claim raised at the state level and a federal claim will not satisfy the exhaustion doctrine.  *Id.*

authorized successive habeas proceedings on this claim.[25]   The Court of Criminal Appeals dismissed Sorto's successive habeas application because it did not comply with the statutory requirements of Article 11.071, § 5.

Federal review is precluded when a reviewing state court "clearly and expressly [indicates] that the state court decision is . . . based on bona fide separate, adequate, and independent [state law] grounds." *Michigan v. Long,* 463 U.S. 1032, 1041 (1983).  When a state court decision is ambiguous about the ground of the decision, then a federal court must review the claim.  *Long,* 463 U.S. at 1040–41; *Coleman*, 501 U.S. at 733 (when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law" and "[does] not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition").  Sorto argues that the Court of Criminal Appeals' dismissal is insufficient to bar federal review because the succinct order did not clearly and expressly rely on an independent and adequate state law ground.

Sorto contends that it is "[indiscernible] whether the [Court of Criminal Appeals] weighed the merits of Sorto's claim and dismissed it because the court found the constitutional violation he suffered was not sufficient or dismissed the claim due [to] state procedural grounds." (Docket Entry No. 37 at 12.)  However, the Court of Criminal Appeals indicated that

---

[25] Specifically, Sorto alleged:

The admission of evidence of extraneous offenses during the guilt/innocence phase of his trial violated his Fourteenth Amendment rights. . . .  The evidence present[ed] below and the evidence that will be developed by funding from the Court will demonstrate by clear and convincing evidence that, but for these violations, no rational juror would answer in the state's favor on at least one of the special issues. . . .  Further, the factual bases of these claims were unavailable with reasonable diligence at the time the prior application was filed.

Successive State Habeas Record at 35.

it based its dismissal on state procedural grounds. The court articulated that Sorto's application did not meet the requirements of Article 11.071, § 5, and went on to say that the 2010 state habeas application did "not contain sufficient specific facts establishing that but for a violation of the United States Constitution, no rational juror would have answered one or more of the special issues in the State's favor." *Ex parte Sorto*, Nos. WR-71,381–03, 2011 WL 1533377, at *1 (Tex. Crim. App. Apr. 20, 2011). Neither statement indicates a dismissal based on federal law. The Fifth Circuit has held that the statement that a successive habeas application fails to satisfy Article 11.071, § 5, provides an independent and adequate state procedural grounds for dismissal. *Balentine*, 626 F.3d at 851.[26] The second statement in the Court of Criminal Appeals' order—that Sorto's 2010 state habeas application did not contain "sufficient specific facts to establish that but for a violation of the United States Constitution, no rational juror would have answered one or more of the special issues in the State's favor"—does not alter this conclusion. Indeed, this second statement is nothing more than a recitation of the procedural rule embodied in Article 11.051, § 5(a)(3).

Because Sorto raised no new facts, did not rely on new law, and made no actual-innocence argument applicable to this claim, the Court of Criminal Appeals could dismiss this claim based only on its procedural law. Simply, there was "nothing in [the Court of Criminal Appeals'] perfunctory dismissal of the claims that suggest[ed] that it actually considered or ruled on the merits." *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008). Because Sorto did not present this claim to the state court in a procedurally adequate manner, rendering the state

---

[26] As previously noted, this general rule does not remain true when an actual-innocence-of-the-death-penalty claim substantially overlaps with the underlying alleged constitutional violation. *See supra* Part II.A.2. A substantial overlap does not occur with Sorto's extraneous offense claim.

court unable to adjudicate his claim, this Court likewise cannot reach the merits unless Sorto can overcome the procedural bar.

A state procedural default is not an insurmountable barrier to federal review. The Supreme Court excuses a procedural bar if an inmate "can demonstrate *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a *fundamental miscarriage of justice*." *Coleman*, 501 U.S. at 750 (emphasis added). A petitioner shoulders the burden of overcoming this procedural hurdle. *See McCleskey v. Zant*, 499 U.S. 467, 493–94 (1991). Sorto makes no argument that he can overcome the procedural bar. Thus, adequate and independent state procedural law precludes consideration of this claim.

### B.    Alternative Review of the Merits

In the alternative, Sorto has not shown that his Fourteenth or Eighth Amendment arguments merit federal habeas relief. *Cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Sorto had confessed to kidnapping the two victims and sexually assaulting Ms. Rangel. Because he claimed that he was not nearby when Cubas fired the fatal shots, Sorto's "intent was a hotly contested issue at trial." *Sorto v. State*, 173 S.W.3d 469, 491 (Tex. Crim. App. 2005). The jury instructions allowed for Sorto's conviction as the shooter, as a party, or as a conspirator. The State of Texas did not present any affirmative evidence conclusively proving that Sorto was the one who shot the two victims. The State nonetheless urged the jury to find Sorto guilty of murder. Sorto had told the police that, as

he walked away, he heard Cubas shoot one woman twice and the other once.  Sorto accurately

described which of the two women had been shot twice.  The State argued:

> How did he know there was two shots on Rangel and one shot on Capulin?  Two
> ways he knew that.  Either he is . . . doing the shooting; or he is standing by
> Cubas, aiding and assisting him shoot those two women.  That's the only way he
> knew the location and how many shots those women—how many times those
> women were shot.  It is impossible, if he is half a block away, to know that.  He
> slipped up.  He is forgetting his lies.

Tr. Vol. 34 at 70–71.[27]  On that basis, the State inferred that Sorto may have fired the fatal shots.

Alternatively, the State argued that Sorto was responsible as a conspirator or party even if

he did not shoot the women.  The jury instructions allowed for Sorto's conviction if he (1)

"solicit[ed], encourage[d], direct[ed], aid[ed], or attempt[ed] to aid" in the murder; or (2) should

have anticipated their murders as part of the conspiracy to rape them.  Clerk's Record at 351–52.

The State sought to prove that Sorto knew that the women would be murdered that night.

To prove that Sorto knew the abduction and rape of the women would end in murder, the

State moved to present testimony about the murder of fifteen-year-old Esmeralda Alvarado.  Tr.

Vol. 30 at 75–76.  Sorto had confessed to the police that, four months before the murders in the

instant case, he had been involved in the rape of Ms. Alvarado and was present when Cubas had

killed her.  Tr. Vol. 42, State's Ex. 6A.

The State called witnesses to explain the circumstances surrounding Ms. Alvarado's

murder, but relied heavily on Sorto's police statements describing the crime.  The Court of

Criminal Appeals summarized Sorto's confession on direct appeal as follows:

---

[27] Nothing required the jury to believe all that Sorto said in his confession. The jury was free to disregard
Sorto's statement that Cubas was responsible for the murder of Ms. Alvarado.  *See Bonham v. State*, 680 S.W.2d
815, 819 (Tex. Crim. App. 1984) ("Clearly from their verdict, the jury chose to disbelieve appellant's exculpatory
statements made in his written confession and introduced into evidence by the defense.  That is their prerogative and
we can not disturb their finding.").

[Sorto] stated that one night in January 2002 he and Cubas were driving around in a truck belonging to Cubas'[] father.  They passed by a young girl talking on a pay phone, and Cubas said that he wanted to have sex with her, so he turned the truck around and went back to where she was standing.  Cubas forced her at gunpoint to get into the back seat of the truck and [Sorto] got into the back seat with her.  Cubas tied a rag over the girl's eyes and drove them to a deserted area.  [Sorto] stayed in the truck while Cubas took the girl outside and raped her.  When they returned to the truck [Sorto] made her get into the back seat with him, and he raped her.  They initially planned to leave her at the scene, but as they were leaving she yelled, "Hey don't leave me here."  They let her back into the truck, and she asked them to drop her off near her home.  Cubas started to drive away, but then decided to take her back to where they had raped her.  They got out of the truck and Cubas made her perform oral sex on him.  Cubas then shot her in the head, and he and [Sorto] got into the truck and drove away.

*Sorto v. State*, 173 S.W.3d 469, 475 (Tex. Crim. App. 2005).

Generally, Texas does not permit the admission of extraneous offenses in the guilt/innocence phase.  Such evidence, however, may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."  TEX. R. EVID. 404(b).  Even so, the trial court may still exclude such evidence if "its probative value is substantially outweighed by the danger of unfair prejudice."  *Id*.  The trial court admitted evidence of Ms. Alvarado's murder because the fact that "this defendant was involved with another defendant in a similar offense" gave some indication of "intent that the victim could be or would be killed this time."  Tr. Vol. 30 at 83.

The prior murder became a prominent feature in the State's guilt/innocence closing arguments.  The prosecution contended that killing the two women was "[a]ll part of their plan.  And you know it was part of their plan . . . because back on January 18th, they did the same thing to [] 15-year-old Esmeralda Alvarado.  This isn't the first time that they have been together prowling and kidnapping women and taking them somewhere.  [Sorto] knew what was about to

happen." Tr. Vol. 34 at 69. The prosecutor emphasized that Sorto should have anticipated that Cubas would kill the two women because the crime was similar to the one they had committed before:

> He should have anticipated. Because . . . they kidnapped Esmeralda Alvarado. They took her to a deserted location two and a half blocks from where he works in the ship channel. Nobody around. They sexually assault her, and then they shoot her in the head. And he says Cubas says, "We've got to shoot her in the head because she can identify us."
>
> . . . .
>
> They don't want Maria Rangel or Capulin to come in here and be able to testify and point the finger at him and say, "Back on May 31, 2002 that is the man that kidnapped me, robbed me, sexually assaulted me." It makes no sense to think that they did all this, took them to a secluded place, and think, "We're going to let them live. We're going to let them go to the police and tell them what we look like, how tall we are, what color we are, how much we weigh." Common sense. Common sense.

Tr. Vol. 34 at 71–72. The prosecution argued that, because Sorto knew that the kidnapping and sexual assault would lead to killing, he had the requisite intent for capital murder. Tr. Vol. 34 at 80.

Sorto claims that the evidence of the extraneous offense violated his rights under both the Fourteenth and the Eighth Amendments. Under his Fourteenth Amendment argument, Sorto contends that jurisprudence involving the comparable rule of federal procedure shows that the introduction of the prior murder violated his constitutional rights. Sorto's Eighth Amendment argument focuses on the requirement from *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), that "the death penalty [cannot] be imposed in a felony murder case if the defendant was a minor participant in the crime and neither intended to kill nor had shown reckless indifference to human life." *Hopkins v. Reeves*, 524 U.S. 88, 94 (1998). In

essence, Sorto contends that the State violated the Constitution by focusing on Cubas', not his, intent in killing the two women.  Even if the merits of these arguments were fully before the Court, Sorto has not shown that his arguments entitle him to federal relief.

### 1.    The Fourteenth Amendment

Sorto argues that the trial court erred in admitting evidence of his involvement in Ms. Alvarado's murder. First, Sorto argues that under Texas Rule of Evidence 404(b), the evidence should have been excluded as being more prejudicial than probative.[28]  Second, Sorto argues that the evidence would not be admissible under the comparable rule of federal procedure. Sorto requests the Court to apply the two-prong test outlined in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978), to determine the admissibility of extraneous offense evidence.

Federal habeas courts do not "sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998); *see also Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) ("Errors of state law, including evidentiary errors, are not cognizable in habeas corpus."); *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983) ("We have repeatedly admonished that we do not sit as a super state supreme court on a habeas corpus proceeding to review error under state law."); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("In conducting a federal habeas analysis, it is irrelevant whether the evidence was correctly admitted pursuant to state law.").  The Court of Criminal Appeals found on direct appeal that evidence of Ms. Alvarado's murder was admissible under state law.  The Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the

---

[28] Sorto cites *Robinson v. State*, 701 S.W.2d 895, 898 (Tex. Crim. App. 1985), in which the Texas Court of Criminal Appeals outlined the factors to be used in determining the probative value of an extraneous offense.

challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Additionally, Sorto's argument that the extraneous evidence would not be admissible under federal law is irrelevant. A federal court cannot "provide collateral relief simply because the state court's challenged conduct would have led to reversal if the defendant had been tried in the federal system . . . ." *Blankenship v. Estelle*, 545 F.2d 510, 516 (5th Cir. 1977). Regardless of any federal evidentiary rule, Texas state law allowed evidence of Ms. Alvarado's murder to come before the jury.

The Court's sole inquiry is whether the admission of this evidence violated the Constitution. *McGuire*, 502 U.S. at 68. The Due Process Clause only provides relief from an evidentiary ruling that is "so unduly prejudicial that it render[ed] the trial fundamentally unfair . . . ." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); s*ee also Hafdahl v. Johnson*, 251 F.3d 528, 536 (5th Cir. 2001) ("If evidence of an extraneous offense is wrongly admitted, however, habeas corpus relief is proper only if the error is of such magnitude that it resulted in 'fundamental unfairness.'").

Here, Texas law allowed the prosecution to introduce the extraneous evidence as an exception to the character evidence rule in order to demonstrate Sorto's intent. Sorto's intent was a contested issue in trial since he maintained that he had no intent to kill Ms. Capulin or Ms. Rangel. *Sorto v. State*, 173 S.W.3d 469, 491 (Tex. Crim. App. 2005). Evidence of Sorto's participation in Alvarado's murder four months earlier served to rebut his argument that he lacked the requisite intent to promote or assist Cubas in the capital murder in the instant case. *Id.*

52

at 491.  While a major theme in the trial, the Court of Criminal Appeals held under state law that

the evidence was not unduly prejudicial:

> [E]vidence of the Alvarado murder was not so prejudicial that the jury would
> have been unable to limit its consideration of the evidence to its proper purpose.
> In both instances, it was, according to [Sorto], Cubas who did the actual killing in
> exactly the same manner.  There is nothing about Ms. Alvarado's murder that is
> more grisly or gruesome than the double murders at issue here.  And certainly the
> testimony concerning Ms. Alvarado's rape and shooting was much shorter and
> less detailed than the testimony concerning the charged offense.  The extraneous
> evidence focused upon the single evidentiary fact that the charged murders were
> an almost perfect "copycat" of the earlier one.  The jury was entitled to use this
> "copycat" evidence in deciding whether [Sorto] knew that Cubas intended to kill
> the two women, that [Sorto] intended that Cubas kill the two women or
> anticipated that he would do so, and that [Sorto] assisted him in that endeavor.
> The probative value of the evidence was not substantially outweighed by the
> danger of unfair prejudice, and the trial court did not abuse its discretion in
> admitting it over [Sorto]'s Rule 403 objection.

*Sorto v. State*, 173 S.W.3d 469, 491 (Tex. Crim. App. 2005).

For those same reasons, Sorto has not shown any error in admitting the evidence. The

trial court instructed the jury that it could consider the extraneous offense only "in determining

the intent or knowledge of the defendant, if any, in connection with the offense, if any, alleged

against him in the indictment and for no other purpose."  *Id.* at 491 n.91.  Given this limiting

instruction and the context in which the evidence was introduced, Sorto has not demonstrated an

evidentiary ruling that is so unduly prejudicial that it rendered the trial fundamentally unfair.

Because of the admissibility of the evidence and its relationship to trial, Sorto has failed to prove

a valid federal due process violation.

### 2.      The Eighth Amendment

Sorto also argues that the "trial court violated [his] Eighth Amendment rights by

permitting his death sentence to stand absent any evidence that he intended to commit murder."

53

(Docket Entry No. 31 at 52.)  He asserts that "[t]he State did not make a strong showing that he murdered Alvarado.  The State knew that Cubas had confessed to the capital murder of Alvarado." (Docket Entry No. 31 at 47.)  Sorto argues that because "this extraneous offense was admitted at trial only to show that [he] had the intent necessary to be charged with capital murder, it should have been inadmissible [under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987)] during the guilt/innocence phase of [his] capital murder trial." (Docket Entry No. 31 at 54.)

The Supreme Court in *Enmund* held that a *death sentence* cannot stand for one who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed."  458 U.S. at 797.  *Tison* qualified *Enmund* by holding that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement."  481 U.S. at 158.  *Enmund* and *Tison*, however, pose no limitation on the evidence the State may rely on in seeking a capital *conviction*.  "*Enmund* and *Tison* apply to the sentencing phase of the trial and not to the guilt/innocence phase."  *Clark v. Johnson*, 227 F.3d 273, 280 (5th Cir. 2000); *see also Walton v. Arizona*, 497 U.S. 639, 649 (1990) ("*Enmund* only places a substantive limitation on sentencing . . . ." (internal quotation marks omitted)), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

Contrary to Sorto's argument, the State had no burden to show that he killed or intended to kill Ms. Alvarado; he was not on trial for that crime.  The extraneous act of her murder came before the jury only to show that, because Cubas had previously killed a woman he and Sorto had raped, Sorto should have "anticipate[d] as a result of the carrying out of the conspiracy" that

54

the victims in this case would die.   Clerk's Record at 353.   Sorto has failed to show that the admission of Ms. Alvarado's murder in the guilt/innocence phase violated *Enmund* or *Tison*.

Insofar as Sorto's briefing may suggest that testimony concerning Sorto's involvement in the rape and murder of Ms. Alvarado was unconstitutional in the sentencing phase, the jury instructions sufficiently focused the jury's attention on Sorto's intent as required by *Enmund* and *Tison*.   The Constitution does not limit the State's presentation of extraneous evidence in the sentencing phase.   *See Brown v. Dretke*, 419 F.3d 365, 376–77 (5th Cir. 2005); *Harris v. Johnson*, 81 F.3d 535, 541 (5th Cir.1996).   Thus, the relevant question is whether the jury instructions properly limited the jury's consideration of the rape and murder of Ms. Alvarado.

In a habeas proceeding, the petitioner must demonstrate that an erroneous jury instruction "had a substantial and injurious effect or influence on the determination of the jury's verdict." *Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir. 1999).   The burden of demonstrating that the error violated the petitioner's due process rights is "greater than the showing required to establish plain error on direct appeal."   *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).   Under the facts of this case, Sorto cannot show that the jury did not base his death sentence on his *own* culpability, particularly when the second special issue asked:

> Do you find from the evidence beyond a reasonable doubt that Walter Alexander Sorto, the defendant himself, actually caused the deaths of Roxana Aracelie Capulin and Maria Moreno Rangel, on the occasion in question, or if he did not actually cause the deaths of Roxana Aracelie Capulin and Maria Moreno Rangel, that he intended to kill Roxana Aracelie Capulin and Maria Moreno Rangel, or that he anticipated that a human life would be taken?

Clerk's Record at 402.   The Fifth Circuit has found that similar instructions sufficiently center a jury's attention on the defendant's individual actions and intent.   *See Ramirez v. Dretke*, 398

F.3d 691, 697 (5th Cir. 2005).  The evidence so strongly supported a "yes" answer to the second special issue that trial counsel conceded the point in closing arguments of the sentencing phase. Tr. Vol. 39 at 51.  Because the sentencing phase held Sorto responsible for his own actions, his Eighth Amendment claim lacks merit.  In conclusion, even if state procedural law did not bar federal review of Sorto's second claim, he has not shown that evidence of an extraneous murder in the guilt/innocence phase violated his constitutional rights.

## IV.  <u>Representation by Trial Counsel</u>

Finally, Sorto brings a *Strickland* claim against his trial attorneys for ineffective assistance of counsel.  Sorto claims that his trial counsel inadequately defended against a death sentence because they failed to subpoena witnesses who were key to the mitigation special issue. In his federal petition, Sorto characterizes the case put on by trial counsel as "quite limited," "cursor[y]," and "consisting of few witnesses."  (Docket Entry No. 31 at 93.)  Sorto argues that trial counsel should have made a broader investigation into his background and presented a more robust sentencing phase case.  Specifically, Sorto faults trial counsel for ignoring or inadequately presenting evidence of:

(1)   adaptive deficits to support a putative diagnosis of intellectual disability;

(2)   childhood and adult exposure to toxic and harmful chemicals, particularly pesticides while working in the fields as a child;

(3)   overwhelming childhood poverty;

(4)   childhood abuse, including forced labor at a young age, brutal beatings, and torture by family members;

(5)   the damaging effects of growing up during the Salvadorian Civil War; and

(6)   post-traumatic stress disorder ("PTSD").

### A.    Legal Standard

The Supreme Court has repeatedly emphasized the weighty responsibility counsel bears in defending against a death sentence.  *See generally Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000).  In appraising whether an attorney's investigation and presentation of mitigation evidence complies with this constitutional mandate, courts evaluate the facts against the standard set by *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The *Strickland* inquiry asks whether "a defense attorney's *performance* f[ell] below an objective standard of reasonableness and thereby *prejudice[d]* the defense."  *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (emphasis added); *see also Wiggins*, 539 U.S. at 520.  Courts have also shown great deference to an attorney's use of strategy.  Once supported by an adequate investigation, "counsel's selection of a strategy is unchallengeable . . . ."  *Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007); *see also Strickland*, 466 U.S. at 690.

"Surmounting *Strickland*'s high bar is never an easy task . . . ."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  In federal habeas proceedings, the *Strickland* inquiry merges with AEDPA's forgiving standards into a "doubly deferential" review.  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Pinholster*, 131 S. Ct. at 1403; *Gentry*, 540 U.S. at 5–6.  In practice, this standard gives wide latitude to state adjudications: "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Richter*, 562 U.S. at 105; *see also Premo v. Moore*, 562 U.S. 115, 123 (2011) (quoting *Richter*).

**B.    Procedural Bar**

As a preliminary matter, the manner in which Sorto has litigated his *Strickland* claim raises procedural concerns.  Sorto first presented elements of his *Strickland* claim in his 2005 state habeas application.  He then augmented the claim in his 2010 federal habeas petition.  This Court stayed the case to allow for the exhaustion of state-court remedies.  Sorto included the expanded *Strickland* claim in his 2010 state habeas application, which was dismissed by the Court of Criminal Appeals on procedural grounds.  Respondent argues that only those matters included in the 2005 state habeas application are properly before this Court.  Sorto responds that the exhaustion of the *Strickland* claim in his 2005 state habeas application should allow federal consideration of the arguments first raised on federal review.

Because habeas procedure "respect[s] the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as all factual allegations supporting those grounds," *Knox v. Butler*, 884 F.2d 849, 852 n.7 (5th Cir. 1989), the exhaustion requirement traditionally "is not satisfied if a petitioner presents new legal theories or entirely new factual claims in his petition to the federal court."  *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983) (footnote omitted); *see also Anderson v. Harless*, 459 U.S. 4, 6–7 (1982); *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).  Simply, Sorto's 2005 state habeas application did not provide "the state's highest court with a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations."  *Ruiz v. Quarterman*, 460 F.3d 638, 642 (5th Cir. 2006).

Because the state courts procedurally barred Sorto's attempt to expand his *Strickland* claim in the 2010 state habeas application, the only claims properly before the Court are the

claims and evidence Sorto submitted in the 2005 state habeas application.  The Court will apply
AEDPA to the issues raised in that proceeding.  In the interests of justice, however, the Court
will separately consider the merits of Sorto's expanded *Strickland* claim in the alternative.[29]

### C.    Sorto's Mitigation Defense at Trial

Once the jury found Sorto guilty of capital murder, only two possible sentences
remained: death or life with the possibility of parole.  The record is replete with evidence that
trial counsel prepared and presented mitigating evidence, calling both lay and expert witnesses in
an effort to place sympathetic evidence before the jury.  Trial counsel demonstrated familiarity
with Sorto's background and the issues raised by his difficult history of poverty, abuse, and
trauma.  This is not a case where trial counsel completely abdicated the duty to defend against a
death sentence.  The question is whether trial counsel did enough.

Trial counsel faced a formidable task in securing a life sentence.  The State's case in the
punishment proceedings emphasized Sorto's prior violent criminal history.[30]  The State had a
long roster of witnesses who described Sorto's numerous violent acts.  Tr. Vol. 35 at 3.  In
addition, the State presented evidence of Sorto's previous crimes involving Cubas that were

---

[29] Sorto, however, claims that he can overcome the procedural bar by showing cause and actual prejudice.
Sorto's argument for cause alleges that his state habeas counsel provided ineffective assistance by not developing
his expanded *Strickland* claim in state court.  In *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1320 (2012), the
Supreme Court recently found that ineffective assistance by a state habeas attorney may amount to cause under some
circumstances.  *See Trevino v. Thaler*, ___ U.S ___, 133 S. Ct. 1911 (2013) (applying *Martinez* to cases arising from
Texas courts).  To meet the cause exception under *Martinez*, an inmate must: (1) prove that his habeas attorney's
representation fell below the standards established in *Strickland* and (2) show that his underlying ineffective-
assistance claim "has some merit[.]"  *Martinez*, 132 S. Ct. at 1318; *see also Crutsinger v. Stephens*, 540 F. App'x
310, 317 (5th Cir. 2013); *In re Sepulvado*, 707 F.3d 550, 556 n. 12 (5th Cir. 2013).  This Court will review the
merits of Sorto's expanded *Strickland* claim in the alternative.  For the same reasons that the Court finds that habeas
relief is unavailable on that claim, the Court finds that state habeas counsel did not provide ineffective assistance and
that that his failure to raise the claim did not actually prejudice Sorto.

[30] Sorto stipulated that he had been convicted for the misdemeanor offenses of carrying a weapon and of
theft.  Tr. Vol. 35 at 8.  Also, Sorto stipulated that he had received felony deferred adjudication for aggravated
robbery for which he received ten years probation.  *Id.* at 111–112.

similar to the crime at issue.  *See, e.g.*, *id.* at 13.  All in all, the State made a strong case that Sorto was a violent man.  The jury had a clear basis to prognosticate that his violence would persist well into the future.  The following decisions taken by trial counsel should be viewed in the lens of deference to attorney strategy since "counsel's selection of a strategy is unchallengeable . . . ."  *Bower*, 497 F.3d at 467; *see also Strickland*, 466 U.S. at 690.

Trying to maintain credibility with jurors in light of Sorto's violent background, trial counsel did not encourage the jury to answer the first special issue—the "future dangerousness" question—in Sorto's favor.  Instead, the defense conceded before the jury that the evidence "might be enough for [the jury] to conclude that there is a probability that [Sorto] would commit criminal acts of violence that constitute a continuing threat to society."  Tr. Vol. 39 at 44–45. Sorto's trial counsel, Alvin Nunnery, explained this seemingly inapposite stance by telling the jury that, while he had been trained as an advocate "never to yield," lawyers sometimes "engag[ed] in the ridiculous and actually ended up insulting people."  *Id.* at 44.  The defense strategically decided not to argue forcefully against an unfavorable answer to the first special issue.

Trial counsel also decided not to argue against an unfavorable answer to the second special issue—that Sorto reasonably anticipated the two women's deaths.  Trial counsel conceded that, when joining Cubas in the rape of the two women, Sorto had anticipated that murder would follow.  *Id.* at 51.  Ultimately, trial counsel focused their case on the third special issue, their mitigating evidence.  Given the State's strong evidence of Sorto's violent history, trial counsel's strategy to forego the first two special issues is reasonable and not challengeable.

Therefore, the inquiry turns to the third special issue and whether trial counsel did enough to present a mitigation defense.

Trial counsel amassed a team of experts to assist in the preparation for a mitigation defense. Mr. Nunnery and Mr. Cervantes brought in a third attorney, Patrick F. McCann, to investigate the effects of Sorto's childhood exposure to pesticides. State Habeas Record at 162. Trial counsel also employed a licensed investigator, Rudy Vargas, to investigate Sorto's background. Trial counsel secured the assistance of mitigation expert Lisa Milstein, who "traveled to El Salvador to review Mr. Sorto's life history. As a result of her efforts, [Ms. Milstein] brought several members of his family back from El Salvador to testify about the difficult poverty and abuse he grew up with." *Id.* at 177. Additionally, trial counsel retained Dr. Seth Silverman, a licensed forensic psychiatrist, to evaluate Sorto. *Id.* at 162. Dr. Silverman himself conducted in-depth interviews with family members. In summary, trial counsel had put together a comprehensive mitigation investigation team necessary to uncover a thorough understanding of Sorto's background.

From this investigation, the defense chose to call five lay witnesses in the sentencing phase: Sorto's mother, aunt, sister, wife, and grandmother. *Id.* at 116. Taken together, their testimony painted a holistic picture of Sorto's poverty-stricken childhood in a home without an indoor bathroom or electricity. *Id.* at 118. Sorto's humble beginnings traced back to his illiterate fifteen-year-old mother giving birth to him in a pig trough. *Id.* Sorto grew up with relatives after his mother left to look for work in a different town. *Id.* at 117. Illness-prone, Sorto endured harsh physical discipline from his aunt and grandmother. *Id.* at 118. Quitting school at a young age, Sorto worked in the fields fumigating crops. *Id.* at 117. This difficult childhood played out

61

against the backdrop of the El Salvadorian civil war, a period marked by violence and instability. *Id.* at 118.

Sorto moved to the United States at age nineteen. *Id.* He married and had three children. *Id.* at 119. While separated from his wife, he moved in with Cubas. *Id.* After Sorto reunited with his wife, Cubas pressured him to commit crimes by threatening Sorto's wife. *Id.*

Dr. Silverman's testimony at the punishment phase placed this difficult background into a psychological context. Dr. Silverman explained that, as a child, Sorto had been punished severely, beaten, and was a victim of sexual abuse on at least one occasion. *Id.* at 121. Malnourishment, illness, and a lack of opportunity marked his childhood. *Id.* Despite those disadvantages, Sorto had no criminal history while living in El Salvador. *Id.* Dr. Silverman opined that Sorto worked hard and provided for his family when he moved to the United States. *Id.* Dr. Silverman attributed Sorto's late initiation into lawlessness to Cubas' influence. *Id.* While the defense had chosen to de-emphasize the future dangerousness issue, Dr. Silverman still explained that, given the rigors of incarceration, Sorto would likely not be violent in the future. *Id.* at 122.

**D.    The *Strickland* Claims Raised in Sorto's 2005 State Habeas Application**

Sorto first challenged the breadth and depth of the sentencing phase defense in his 2005 state habeas application. Sorto faulted trial counsel's mitigation case on three grounds. First, Sorto alleged that trial counsel "diminished the importance of the future dangerousness issue in the opening statement to the jury" and thus "undermin[ed] expert testimony about the likelihood of diminished violence in the future." *Id.* at 78. Second, Sorto blamed his attorneys for not adducing evidence of PTSD in his childhood caused by El Salvador's violent civil war. Sorto

claimed that trial counsel should have drawn a link between the violence he saw as a child and his violent acts as an adult.  Third, Sorto claimed that trial counsel should have presented evidence that "exposure to strong chemical fumes"—both while working in cotton fields as a youth and in the shipyards in Houston as an adult—"could have caused some organic brain damage."  *Id.* at 84.

Sorto did not support his habeas claim with affidavits from uncalled witnesses or new mental-health evidence.  Instead, Sorto relied only on an affidavit that he prepared himself which, in relevant part, stated:

> I also want to say that I appreciate the hard work of my trial attorneys, but there were more points that I wanted them to make, and I do not believe they talked to me enough about those things.  I appreciate the testimony of Dr. Silverman, and I believe his testimony about future violence should have been stressed.  It was not my choice to treat the "future danger" issue as being less important, but the lawyers did not ask my opinion.  The lawyers also should have put more emphasis on the experiences I had while growing up of seeing warfare and dead people.  I am no expert, but I think seeing all of that may have influenced my attitude toward life and death and made it easier for me to hurt people and to accept it when Cubas hurt people.
>
> My lawyers also did not talk to me very much about my exposure to dangerous chemicals.  It was not just while I was a boy in El Salvador.  I also worked in the Houston area cleaning ships and barges.  The workers were supposed to have special safety equipment but, like many of the workers, I found it too hard to work with the equipment.  I am not a doctor so I do not know if exposure to chemicals affected my ability to think about what I should have done in the situations which ended up with people being hurt and killed.

*Id.* at 98.

Sorto's trial counsel, Mr. Nunnery and Mr. McCann, filed affidavits discussing their approach to mitigation in this case.  *Id.* at 161–62, 177.  Mr. Nunnery explained how, given Sorto's extreme violence, the defense chose "to concentrate on mitigation and not lose credibility

with the jury" by arguing that he would not engage in future violence.  *Id.* at 161.  Mr. Nunnery declared that "[t]here was no expert testimony in my mind that the state's evidence at punishment could not overcome beyond a reasonable doubt with respect to future dangerousness."  *Id.*

Trial counsel also addressed the deliberate decision not to present evidence of chemical exposure and PTSD.  Describing the defense's efforts to ascertain his exposure to pesticides, including Ms. Milstein's trip to interview family members in El Salvador, Mr. Nunnery said: "In response to the claim counsel failed to develop mitigating evidence concerning Mr. Sorto's post-traumatic stress and evidence of Mr. Sorto's exposure to hazardous chemicals, no such evidence arose worthy of presentation at his trial."  *Id.* at 161–62.[31]  Mr. McCann added that: "we could find no evidence as to what Mr. Sorto may have been exposed to nor any evidence as to quantity or exactly when he might have been exposed."  *Id.* at 177.

The paucity of specific information was not the only reason the defense chose not to present evidence of chemical exposure.  The defense could not tie that chemical exposure to long-term difficulties:

---

[31] Trial counsel explained:

There were claims of pesticide exposure but the type of pesticides as well as the extent of exposure could never be documented.  Not one time was Mr. Sorto or a member of his family ever able to even say what company he worked for so as to isolate any pesticide usage to a particular substance or particular point in time.

The claim of PSTD was even more tenuous.  Dr. Silverman explored this in detail and found nothing of significance worthy of presentation to a jury beyond mere conjecture.

Finally Mr. McCann did extensive research on the pesticide issue and concluded the science with respect to effects on humans was at best speculative and to the extent it existed Mr. Sorto's life style was not indicative of one suffering from pesticide exposure.  Specifically the physical effects of exposure thought to be associated with pesticides were not present in Mr. Sorto.

State Habeas Record at 162.

> Mr. Sorto was a robustly healthy laborer who worked a difficult manual job requiring strength and dexterity.  He had four children by two women and was clearly implicated in several rapes.  He showed no cognitive impairments, despite some testimony of his family that he had difficulty in the first grade.  He was clearly aware of his situation and able to assist us in his case, and provided us with a great deal of information that was helpful.  He was examined by our psychiatrist, who testified at his punishment phase, and who detected no real evidence of such impairment.  We also had a brain scan conducted offsite prior to trial and it showed no evidence of organic disruption, though of course it is always possible the doctors missed something.  We thus had no real evidence of any effects, nor could we in truth show for certain that he was even exposed, or to what or when.  We discussed trying to use this evidence as a team and determined that it would likely undermine the credibility of our other efforts, which still produced two days of debate within the jurors despite evidence of Mr. Sorto being linked to at least five killings and numerous rapes and robberies.

*Id.*  Because "the defense team believed it was without merit and would undermine the other aspects of the mitigation case [they] had developed," trial counsel decided not to present evidence of PTSD or chemical exposure.  *Id.* at 162.

### 1. *State court adjudication*

The lower state habeas court issued explicit factual findings and legal conclusions in recommending that the Court of Criminal Appeals deny relief.  As an initial matter, the state habeas court lauded trial counsel's efforts to defend Sorto:

> The Court finds based on the trial record and personal recollection that trial counsel vigorously defended [Sorto].  The presiding judge remarked at the close of the guilt-innocence phase of trial that trial counsel had worked 'very hard' in representing [Sorto] and that counsel started preparation for trial well in advance.

*Id.* at 196–97.  With that regard for counsel's efforts, the state habeas court found no *Strickland* error in the three areas identified by Sorto.

Reviewing the extensive evidence of Sorto's violent history,[32] the state habeas court ratified trial counsel's choice to de-emphasize the future dangerousness issue.  With the evidence conclusively showing that Sorto was a violent man, counsel made a tactical decision to take the spotlight off the future dangerousness issue.  The state habeas court endorsed trial counsel's "sound decision regarding punishment to concentrate on persuading the jury to answer the mitigation special issue in [Sorto's] favor."  *Id.* at 198, 207.

The state habeas court also found no constitutional error in the investigation and presentation of PTSD and chemical-exposure evidence.  Sorto did not provide a sturdy evidentiary foundation for his arguments.  Only Sorto's affidavit supported his state habeas claim.  Accordingly, the state habeas court observed that Sorto "fail[ed] to demonstrate that witnesses or evidence were available to support [his] claims regarding PTSD and/or hazardous chemical exposure."  *Id.* at 200.  Without affirmative support for Sorto's claims, the state habeas court found that trial counsel had engaged in an adequate investigation to rule them out as viable defensive strategies.

Specifically, trial counsel had "conducted extensive research and investigation regarding [Sorto's] alleged hazardous chemical exposure . . . ."  *Id.*  The state habeas court observed that

---

[32] The state habeas court summarized:

The Court finds based on the trial record that the State presented evidence at trial regarding the instant capital murder offense and [Sorto's] confession to the offense; [Sorto's] participation in the capital murder of fifteen-year-old complainant Esmeralda Alvarado; [Sorto's] prior misdemeanor convictions for carrying a weapon and theft; [Sorto's] commission of an aggravated robbery; and his felony deferred adjudication probation status for that offense when he committed the primary offense; [Sorto's] participation in an August 14, 1999 robbery and shooting; [Sorto's] commission of a robbery on December 8, 2001 that resulted in one homicide and one wounded victim; and [Sorto's] participation in a January 19, 2002 nightclub robbery and shooting.

State Habeas Record at 197.

trial counsel "employed a mitigation expert who traveled to El Salvador to investigate [Sorto's] childhood and obtain relevant information . . . [including] claims of pesticide exposure, but the defense could never determine the type of pesticide or the extent of [Sorto's] alleged pesticide exposure." *Id.* at 199.   Additionally, trial counsel could not identify any contemporaneous mental problem caused by childhood chemical exposure, but observed that Sorto's "physical and mental functioning were not consistent with hazardous chemical exposure" and that he "displayed no cognitive impairments." *Id.* at 200.   Accordingly, the state habeas court found that Sorto "fail[ed] to demonstrate that witnesses or evidence were available to support [his] claims regarding . . . hazardous chemical exposure . . . ." *Id.*

Likewise, the state habeas court relied on trial counsel's efforts and Dr. Silverman's examination to find no evidence of PTSD.   The habeas court found that Dr. Silverman had "explored [Sorto's] PTSD claim in detail but determined that such claim did not amount to anything more than conjecture and did not merit presentation to the jury . . . ." *Id.* at 199.   Trial counsel had "a brain scan conducted on [Sorto] prior to trial that revealed no evidence of organic disruption . . . ." *Id.* at 200.   Dr. Silverman testified at trial that "he was not aware that [Sorto] had a disease or mental disorder; that [Sorto] was of at least average intelligence; that there was no record of [Sorto] having an organic brain disorder . . . ." *Id.* at 201; *see also* Tr. Vol. 38 at 172–73.[33]

---

[33] Even then, the state habeas court did not see PTSD as a game-changing defensive theory.   The state habeas court found that the "suggested mitigation evidence that seeing warfare and dead people may have influenced [Sorto's] attitude towards life and death and [his] experiences may have made it easier for [him] to hurt people and accept Cubas' actions, may have been harmful to the defense in that such evidence would have made it even easier for the jury to find against [Sorto] on the issue of future dangerousness and diminished the defense's case on mitigation."   State Habeas Record at 201.

Given the trial attorneys' efforts, the evidence they amassed, and Sorto's failure to adduce evidence to support his claims, the state habeas court found that "trial counsel's investigation of [Sorto's] potential mitigating evidence was objectively reasonable and consistent with a coherent trial strategy." State Habeas Record at 201. In addition, the state habeas court found no prejudice:

> Based on the facts of the primary offense, [Sorto's] involvement in the capital murder of fifteen-year-old complainant Esmeralda Alvarado, [Sorto's] prior convictions, and [Sorto's] extraneous offenses, [he] fails to demonstrate by a reasonable probability that, absent the alleged errors of trial counsel, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant [a] death sentence.

*Id.* at 206.

### 2. AEDPA review of the claims Sorto raised in his 2005 state habeas application

Sorto's subsequent litigation has renewed the arguments he raised in his first habeas proceeding. For federal habeas relief to become available on those claims, Sorto must show that the state habeas court's adjudication was "contrary to, or an unreasonable application of, federal law." 28 U.S.C. § 2254(d)(1). The Constitution demands that an attorney "make reasonable investigations or . . . make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690–91. As stated earlier, this is not a case where trial counsel "failed to pursue known leads" or "ignored . . . useful information . . . ." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009). On the contrary, trial counsel engaged in "extensive research and investigation" into the possibility of raising a PTSD or chemical-exposure defense. State Habeas Record at 200. To that end, trial counsel employed a team of investigators who tried to establish the factual bases for those arguments. Mr. Nunnery and Mr.

Cervantes sought the assistance of a third attorney, Mr. McCann, to focus primarily on the pesticide-exposure theory.   Still, trial counsel could not verify important factual predicates necessary to establish a firm foundation for those claims.

In his 2005 state habeas application, Sorto could not do so either.  Sorto "bore the burden of demonstrating that counsel's performance was deficient."  *Brown v. Thaler*, 684 F.3d 482, 4999 (5th Cir. 2012) (citing *Strickland*, 466 U.S. at 689).   Sorto did not adduce any evidence, other than his own affidavit, to support his claim that trial counsel should have presented a PTSD or chemical-exposure defense.  Sorto did not indicate which witnesses trial counsel should have subpoenaed, nor did he outline the proposed substance of their testimony.  In short, Sorto did not demonstrate to the state habeas court what crucial information his trial counsel had failed to investigate.  Sorto could only speculate that trial counsel could have fashioned a viable defense from the allegedly underdeveloped theories.  *See Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (disallowing speculation into the substance of unsupported theories about unpresented mitigation evidence).

Importantly, trial counsel had a mental health expert, Dr. Silverman, examine Sorto with the express purpose of assessing whether PTSD or chemical-exposure presented credible issues for the jury's consideration.  Dr. Silverman could not verify those as viable defenses.  Sorto did not give the state habeas court any reason to question Dr. Silverman's judgment.  *See Blanton v. Quarterman*, 543 F.3d 230, 238 (5th Cir. 2008) ("As to deficient performance, we note that [the defendant] presented no evidence to suggest [the expert] was unqualified or that trial counsel had reason to question the results of the psychological examination she performed.").[34]   Given the

---

[34] Sorto argues that "the Defense did not retain a qualified PTSD mental health expert to examine Sorto for

lack of factual and psychological support, the state habeas court was not unreasonable in finding no constitutional problem with trial counsel's rejection of those defenses.

Similarly, trial counsel's strategic decision to de-emphasize or concede the future dangerousness issue does not pose a constitutional concern.  Under Supreme Court precedent, "an attorney's strategic choices, usually based on information supplied by the defendant and gathered from a thorough investigation of the relevant law and facts, 'are virtually unchallengeable.'"  *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (quoting *Strickland*, 466 U.S. at 691); *see also Pape v. Thaler*, 645 F.3d 281, 289 (5th Cir. 2011).  Trial counsel knew that the prosecution would parade witnesses before the jury to recount Sorto's violent acts, which the State did.  Trial counsel knew that the State would stress his criminal history, including additional killings.  Trial counsel acted reasonably in conceding the future dangerousness argument in order to bolster credibility for the mitigation case.  Perhaps another attorney would have reached a different conclusion, but "[t]here are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."  *Strickland*, 466 U.S. at 689.

The state habeas court was not unreasonable in failing to find *Strickland* prejudice.  "When a defendant challenges a death sentence[,] the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.  Because Sorto did not adduce any meaningful evidence in his 2005 state habeas application, the

---

possible PTSD symptoms."  (Docket Entry No. 31 at 98.)  Sorto, however, does not describe why Dr. Silverman's education and experience were insufficient to identify and diagnose PTSD.

state habeas court was left to conclude that, even if trial counsel performed as Sorto wished they had, the jury would have had before it the same evidence favoring a death sentence.  In addition to the very serious crime for which Sorto was convicted, the State had presented evidence linking him to murders, aggravated sexual assaults, several robberies in which shots were fired, and various misdemeanor offenses.[35]   Given the record before the state habeas court, it was not unreasonable for the state court to deny relief based on Sorto's 2005 state habeas application.

### E.    The Amplified *Strickland* Claim

Claims Sorto raised in his successive state habeas action are procedurally barred; however, the Court will still address the substance of Sorto's argument in the alternative.  Even if a procedural bar did not prevent federal consideration, Sorto's amplified *Strickland* claim does not merit habeas relief.  Sorto's 2010 federal habeas petition repeated and expanded upon several of the allegations from his 2005 state habeas application.[36]   The amplified *Strickland* claim is again presented in the amended federal habeas petition now before the Court.  Sorto alleged that trial counsel failed to investigate and present evidence relating to: (1) the adaptive-deficit prong of the *Atkins* inquiry; (2) the overwhelming childhood poverty in which he lived; (3) the beatings and abuse he received as a child; (4) the long-lasting effects from having grown up during El Salvador's violent civil war; and (5) the effects of exposure to pesticides and other chemicals.

---

[35] Supreme Court precedent plainly anticipates that the severity of the crime is an important, though not necessarily overriding, factor in *Strickland* prejudice.  *See Smith v. Spisak*, 558 U.S. 139, 153 (2010); *Strickland*, 466 U.S. at 699; *see also Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime.").

[36] Sorto first presented elements of his *Strickland* claim in his 2005 state habeas application.  Sorto then augmented the claim in his 2010 federal habeas petition.  This Court stayed the case to allow for the exhaustion of state-court remedies.  Sorto included the expanded *Strickland* claim in his 2010 state habeas application, which was dismissed by the Court of Criminal Appeals on procedural grounds.

The major difference in Sorto's expanded *Strickland* claim is that, for the first time, Sorto substantiated his allegations of ineffective assistance with evidence.  He submitted affidavits from: Jose Rolando Sorto Mendez (an uncle); Maria Dolores Sorto (an aunt); Myra Margarita Orantes (a younger half-sister); Franklin Cruz (a fellow grade school student); Yaceni del Carmen Funes Mendez (a younger half-sister); and Ramon Mendez (a cousin).  Sorto claimed:

> Had the Defense conducted a detailed investigation into Sorto's social history and conducted meaningful interviews of individuals familiar with his background, counsel would have uncovered a wealth of mitigating information regarding the tortured childhood he suffered.  Specifically, Petitioner suffered from extreme poverty and malnutrition throughout his childhood; was exposed to hazardous chemicals and pesticides as a result of being forced into child labor; was severely and repeatedly beaten as a child by his aunt, uncle, and grandmother; and was exposed to violence, death, and other intensely traumatic situations as a result of a twelve-year civil war.

(Docket Entry No 31 at 94–95.)

Sorto again claims that trial counsel should have performed a more aggressive investigation to support psychological testimony that he suffered from PTSD, chemical exposure, and intellectual disability.  Sorto's new affidavits provide greater detail than the trial testimony about both PTSD and chemical exposure.  The new evidence, for the first time, provides the names of the pesticides Sorto was exposed to and some indication of the extent of his exposure.  Sorto also provides vivid details about the war zone in which he was raised, which are indeed disturbing.   Sorto claims that an effective investigation by trial counsel would have revealed the same information that he provided in his successive petition, allowing for the development of the theories he propounds on federal review.

As already discussed, trial counsel tried to develop a case showing the psychological effects of the civil war and chemical exposure.  Trial counsel thoroughly investigated Sorto's

background.  Dr. Silverman was aware of the traumatic events from his childhood and of his

pesticide use.[37]  The defense's inability "to isolate any pesticide usage to a particular substance

or particular point in time" handicapped any effort to draw psychological conclusions from the

claims of childhood exposure.  State Habeas Record at 162.  Dr. Silverman also "explored [the

possibility of PTSD] in detail" but he "found nothing of significance worthy of presentation to

the jury beyond mere conjecture."  *Id.*

　　　While Sorto's new evidence may provide greater insight into his background, he still has

not shown any lifelong effects from his difficult childhood.  Trial counsel arranged for "a brain

scan [to be] conducted offsite prior to trial and it showed no evidence of organic disruption . . . ."

*Id.* at 177.  Trial counsel's own observations noted no permanent physical or mental defects

related to Sorto's background.  Sorto has never presented this Court nor the state courts with any

definitive psychological defect related to those conditions.  Sorto claims that "[a] PTSD expert . .

. could have determined whether Petitioner was afflicted with PTSD," but has not presented any

affidavit or other reliable evidence from a psychological expert diagnosing him with PTSD or a

chemical-related brain dysfunction.  (Docket Entry No. 31 at 114.)[38]  Producing evidence of

what chemicals Sorto may have been exposed to and detailing his traumatic past does not change

the fact that no evidence exists to show a corresponding mental problem.  Though Sorto has

---

[37] Outside of the jury's presence, Dr. Silverman explained that he had interviewed Sorto's mother, grandmother, aunt, sister, former neighbor from El Salvador, and the mitigation investigators who had interviewed other witnesses.  Tr. Vol. 38 at 28–29.  Dr. Silverman specifically focused on determining "[w]hether there was anything in Mr. Sorto's background that would make him more vulnerable to these kinds of behaviors . . . ."  *Id.* at 30.

[38] Sorto also included a declaration from Dr. Gilbert Martinez, who recommends that Sorto be tested for intellectual disability.  (Docket Entry No. 15, Ex. 2 ¶ 7.)  Dr. Martinez based his recommendation in part on the newly produced affidavits from Sorto's family members and acquaintances, which indicate risk factors for intellectual disability, including "exposure to chemicals and pesticides."  (Docket Entry No. 15, Ex. 2 ¶¶ 2–3.)  Importantly, Dr. Martinez did not actually diagnose Sort with any mental impairment or psychosis.

provided psychological evidence hinting of a brain defect, it is more than outmatched by what was presented at trial and discovered in the mitigation investigation. The prosecution accentuated this at trial in cross-examining Dr. Silverman:

> The State:    All right.  Now during the defendant's childhood, you make some slide that represented information concerning his  childhood, that he had frequent exposure to pesticides, multiple episodes of head trauma, and the probably loss of  consciousness due to significant head trauma.  But, again, there is nothing that translates into any brain damage or dysfunction in this defendant, is there?

> Dr. Silverman:  Not that can be assessed, no, sir.

Tr. Vol. 38 at 172–73.  Sorto's new information does not undercut the state habeas court's finding that Dr. Silverman "explored [Sorto's] PTSD claim in detail but determined that such claim did not amount to anything more than conjecture and did not merit presentation to the jury . . . ." State Habeas Record at 199.  Trial counsel was under no obligation to present unsupported evidence about an undiagnosed mental condition.  *See Perry v. Quarterman*, 314 F. App'x 663, 668 (5th Cir. 2009) ("Trial counsel was not required to shop for an expert who would diagnose Perry with a disorder for which he had already tested negative or present even more evidence of Perry's genetic past.").

Similarly, Sorto contends that, with additional investigation, trial counsel "would have found a wealth of information directly applicable to the adaptive deficits prong of the intellectual disability standard. Numerous witnesses had extensive personal knowledge of Petitioner's significant limitations in his conceptual, social, and practical skills as defined in the AAMR manual." (Docket Entry No. 31 at 95.)  Sorto has adduced some evidence showing limitations. However, as discussed with regard to his *Atkins* claim, this evidence is contradicted by other

information in the record.  Trial counsel observed no cognitive impairments.  Dr. Silverman believed that Sorto's intelligence was "a little bit above" average.  Tr. Vol. 38 at 168, 171.  The evidence before the defense team, and now before the Court, does not strongly suggest the existence of a viable *Strickland* claim on the issue of intellectual disability.

Sorto also wishes that trial counsel had amplified the evidence of his difficult upbringing.  Conceding that trial counsel sketched out the details of his childhood, Sorto claims that the jury should have had greater insight into the grinding poverty, harsh neglect, and terrible abuse he suffered as a child.  Relying on cases in which federal courts found deficient performance by an attorney who failed to pursue known leads, Sorto argues that trial counsel did not perform an adequate investigation.  *See*, *e.g.*, *Rompilla*, 545 U.S. at 389 (finding counsel deficient for failing to examine easily accessible court file on defendant's prior conviction "despite knowing that the prosecution intended to introduce [defendant's] prior conviction"); *Wiggins*, 539 U.S. at 523–29 (finding counsel deficient for failing to follow up on leads found in a presentence investigation report and a department of social services report); *Williams*, 529 U.S. at 395 (finding trial counsel deficient when he failed to uncover mitigation evidence that graphically described the defendant's "nightmarish childhood").  Sorto lambastes trial counsel for "only cursorily touch[ing] on the wealth of mitigating evidence that was available."  (Docket Entry No. 37 at 22.)  Sorto argues that a competent attorney would have presented the same disturbing details of his childhood in El Salvador as found in his habeas affidavits.

Again, this is not a case where trial counsel neglected to perform a constitutionally adequate investigation into Sorto's background.  Here, the defense contacted all but one of the individuals who provided affidavits supporting Sorto's expanded *Strickland* claim.  The trial

75

investigator traveled to El Salvador and spoke with family members.  Of the individuals who prepared affidavits submitted on federal review, only Franklin Cruz—a fellow grade school student who later moved to Houston—had not been contacted by the defense.  Successive State Habeas Record at 120–21.  Trial counsel's affidavits and the substance of the punishment phase case demonstrate that trial counsel understood the severity of Sorto's background.  Sorto's new affidavits do not disturb the state habeas court's finding from the initial round of habeas review that "trial counsels' investigation of [Sorto's] potential mitigating evidence was objectively reasonable and consistent with a coherent trial strategy."  State Habeas Record at 202.

Once supported by an adequate investigation, "counsel's selection of a strategy is unchallengeable . . . ."  *Bower*, 497 F.3d at 467; *see also Strickland*, 466 U.S. at 690.  From their investigation, trial counsel chose to present "six witnesses at punishment, including some of [Sorto's] relatives from El Salvador, who testified regarding [his] background and the poverty and abuse that [he] sustained during his childhood."  State Habeas Record at 198.  Trial counsel's questioning of witnesses in the punishment phase amply indicates that the defense team understood the poverty, abuse, and war trauma that filled Sorto's childhood.  With that background, trial counsel's approach was to show the jury that Sorto "approached the police regarding the instant offense[,] was not the triggerman in any incident[,] had a difficult childhood[,] and [] had positive character traits."  State Habeas Record at 198.  In short, the trial testimony differed from the habeas affidavits in degree and detail only, not in substance.

The information contained in the new affidavits shows that trial counsel could have presented the jury with greater details about Sorto's background, but this Court "must be particularly wary of 'arguments that essentially come down to a matter of degrees.  Did counsel

investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-guessing.'"  *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)).  It was trial counsel's strategy to question witnesses about Sorto's background in generalities, rather than emphasizing the mitigating features.  Because Sorto did not raise the amplified *Strickland* claim in his 2005 state habeas application, trial counsel could not respond to the allegation that they should have broadened the presentation of that testimony.  Nevertheless, the Court "'must strongly presume that trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy.'"  *Pondexter v. Quarterman*, 537 F.3d 511, 519 (5th Cir. 2008) (quoting *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992)).  Indeed, "[a] court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).

To whatever extent the trial testimony regarding Sorto's upbringing lacked the depth exhibited by Sorto's post-trial evidence, the breadth of the testimony is nearly identical.  The trial evidence largely followed the same themes and allowed for the jury to arrive at the same conclusions as they would have if they had before them the entirety of the mitigating evidence developed after trial.  "It must be conceded that the jury was presented a clear, if not fully portrayed, picture of [the defendant's] life."  *Neal v. Puckett*, 286 F.3d 230, 243 (5th Cir 2002).  "[T]hough perhaps not as effectively as it might have been, the jury did hear [the defendant's] evidence."  *Parr v. Quartermann*, 472 F.3d 245, 258 (5th Cir. 2006).[39]  In this case, trial

---

[39] With the limited case Sorto put in his initial state habeas application, the state habeas judge, who

counsel's evidence was not starkly different from the evidence Sorto presented in his successive petition.  The evidence touched upon the same issues, but not to the same degree.

The Fifth Circuit has distinguished *Rompilla*, *Wiggins*, and *Williams* in circumstances similar to the one before the Court. When the unpresented evidence was not "shocking and starkly different than that presented at trial," the Fifth Circuit has held that a *Strickland* claim is not viable.  *Blanton*, 543 F.3d at 239 & n.1.  Given that trial counsel presented similar mitigating evidence at trial, even if only in outline form, Sorto has not made a strong showing of deficient performance.  *See Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007); *Rodriguez v. Quarterman*, 204 F. App'x 489, 501 (5th Cir. 2006); *Alexander v. Quarterman*, 198 F. App'x 354, 359–60 (5th Cir. 2006); *Parr*, 472 F.3d at 257–58.

Sorto has also failed to show *Strickland* prejudice from the alleged failings by trial counsel's performance.  A court assessing *Strickland* prejudice must review "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation."  *Williams*, 529 U.S. at 397–98; *see also Wiggins*, 539 U.S. at 534 ("[W]e reweigh the evidence in aggravation against the totality of available mitigating evidence."); *Strickland*, 466 U.S. at 695 ("[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.").

---

presided over the trial proceedings, found "unpersuasive" that trial counsel should have "put more emphasis on [Sorto's] childhood experiences."  State Habeas Record at 201.  While the state habeas court made that determination without the insight provided by the new affidavits, the state habeas court was concerned that additional evidence about Sorto's childhood experiences "would have made it even easier for the jury to find against [him] on the issue of future dangerousness and diminished the defense's case on mitigation."  *Id.*

78

The jury had convicted Sorto for his involvement in the rape and murder of two women. Evidence presented by the State made a strong case that this was not an anomaly, but a pattern of behavior. Sorto had escalated from violent robberies, to the rape and murder of one woman, to the rape and murder of two women. The jury could reasonably foresee no end to Sorto's violence. The defense presented a sympathetic case, and Sorto has brought forth a more robust one on federal review, but still has not shown any reasonable probability that the jury would weigh the calculus of sentencing differently. Sorto has not shown the reasonable probability of a different result if his expanded *Strickland* claim were fully before the Court.

Even if a procedural bar did not prevent federal consideration, Sorto's *Strickland* claim does not merit habeas relief. The Court must deny Sorto's *Strickland* claim.

## CERTIFICATE OF APPEALABILITY

AEDPA prevents appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED. R. APP. P. 22(b). Sorto has not yet requested that this Court grant him a certificate of appealability ("COA"), though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Clear and binding precedent forecloses relief on Sorto's claims. Under the appropriate standard, Sorto has not shown that this Court should authorize appellate consideration of any claim. This Court will not certify any issue for review by the Fifth Circuit Court of Appeals.

**CONCLUSION**

In reviewing the record in this case, any fair-minded observer would be left with the conclusion that Sorto must have significant cognitive impairment.  Both the heinous nature of the conduct to which he confessed, and his eagerness to tender to law enforcement his knowledge of the crimes for which he was later convicted, suggest a mental state that is well outside the realm of reason.  Neither Sorto's arguments about his mental condition, however, nor any of his other arguments afford Sorto a right to relief under the tightly circumscribed rubric of federal habeas review.

For the reasons described above, the Court finds that Sorto has not shown an entitlement to federal habeas relief.  This Court **DENIES** Sorto's petition and **DISMISSES** this case **WITH PREJUDICE**.  The Court **DENIES** Sorto's motion for the allocation of funds for additional intellectual-disability testing.  (Docket Entry No. 41.)  The Court **DENIES** all remaining requests for relief.  No certificate of appealability will issue in this case.

**SIGNED** at Houston, Texas, on this 30th day of September, 2015.


KEITH P. ELLISON
United States District Judge